Docusign Envelope ID: 0F8EB316-EC25-8124-8137-FF9B00714B93

ORIGINAL

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| ROBERT CLIVILLES, Plaintiff, -against- FREEDOM WILLIAMS, an individual; FREEDOM WILLIAMS ENTERTAINMENT, LLC; BIG MAC ENTERTAINMENT, LLC; and DOES 1 through 20, Defendants. | Case No. 1:26-cv-04981-DG-PCG PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS, REQUEST FOR JUDICIAL NOTICE, AND MOTION TO STRIKE (ECF NO. 8) |

# PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS, REQUEST FOR JUDICIAL NOTICE, AND MOTION TO STRIKE (ECF NO. 8)

## TABLE OF CONTENTS


PRELIMINARY STATEMENT

LEGAL STANDARD

ARGUMENT

I. Defendants Conflate Featured Guest Performance, Registration, and Proprietary Ownership

II. Plaintiff Alleges an Affirmative Historical and Documentary Basis for His Claimed Rights

- A. The Recording Predated Williams's Participation
- B. Creation and Meaning of C+C Music Factory
- C. The Recording Was Developed and Presented Before a Featured Guest Rapper Was Selected
- D. Williams Had a Separate Recording Relationship Before C+C Music Factory
- E. Williams Was Subsequently Selected as a Featured Guest Rapper
- F. Control Over Featured Guest Personnel


REC'D IN PRO SE OFFICE
SEP 24 '26 AM11:10

Docusign Envelope ID: 0F8EB316-EC25-8124-8137-FF9B00714B93

G. The Sony Agreement Followed the Alleged Creation and Initial Financing

III. The Contemporaneous Contractual History Does Not Identify a Transfer to Williams

IV. The Three-Album History Demonstrates Changing Featured Guest Personnel While C+C Music Factory Continued

V. Plaintiff's Declaration and Other Witness Declarations Corroborate the Alleged Historical Chronology

VI. The 2018 TTAB Judgment Should Receive Its Proper Preclusive Effect and No More

VII. Materially Post-2018 Conduct Requires Separate Analysis

A. Williams's 2026 Use of the C+C Music Factory Identity

B. National and International Dissemination, Public Confusion, and Alleged Injury to Goodwill

C. The July 22, 2026 C+C Music Factory Application Constitutes Additional Post-2018 Conduct

VIII. Registration and Incontestability Do Not Resolve Every Question Presented by This Action

IX. Defendants' Section 43(a) Argument Is Overbroad

X. Limitations and Laches Require Claim-Specific Analysis

XI. Count I, Trademark Infringement

XII. Count II, False Designation of Origin

XIII. Count III, Cancellation

XIV. Count IV, Fraud on the USPTO

XV. Count V, Unfair Competition

XVI. Count VI, Unjust Enrichment

XVII. Count VII, Common-Law Fraud

XVIII. Count VIII, Defamation

XIX. Count IX, Breach of Contract

XX. Big Mac Entertainment, LLC

XXI. Rule 8 Does Not Warrant Dismissal With Prejudice

XXII. The Attorney-Fee Request Does Not Support Dismissal

XXIII. Disputed Historical Facts Should Not Be Resolved Against Plaintiff Under Rule 12(b)(6)

Docusign Envelope ID: 0F8EB316-EC25-8124-8137-FF9B00714B93

XXIV. Plaintiff Alleges a Documented Basis for His Continuing Rights and Continuous Commercial Use

A. Written Agreement Following David Cole's Death

B. Plaintiff Alleges No Transfer to Williams

C. Continuous Commercial Exploitation

D. Plaintiff Alleges No Abandonment

E. Williams's Alleged Request for Permission Is Relevant to the Parties' Course of Conduct

F. Plaintiff Asserts Rights in His Individual Capacity

XXV. Alternatively, Plaintiff Should Be Granted Leave to Amend

CONCLUSION

## TABLE OF AUTHORITIES

**Cases**

Ashcroft v. Iqbal, 556 U.S. 662 (2009)

B&B; Hardware, Inc. v. Hargis Industries, Inc., 575 U.S. 138 (2015)

Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007)

Conopco, Inc. v. Campbell Soup Co., 95 F.3d 187 (2d Cir. 1996)

Cortec Industries, Inc. v. Sum Holding L.P., 949 F.2d 42 (2d Cir. 1991)

Cuoco v. Moritsugu, 222 F.3d 99 (2d Cir. 2000)

Excelled Sheepskin and Leather Coat Corp. v. Oregon Brewing Co., 897 F.3d 413 (2d Cir. 2018)

International Information Systems Security Certification Consortium, Inc. v. Security University, LLC, 823 F.3d 153 (2d Cir. 2016)

Jim Beam Brands Co. v. Beamish and Crawford Ltd., 937 F.2d 729 (2d Cir. 1991)

Lexmark International, Inc. v. Static Control Components, Inc., 572 U.S. 118 (2014)

Loreley Financing (Jersey) No. 3 Ltd. v. Wells Fargo Securities, LLC, 797 F.3d 160 (2d Cir. 2015)

Lucky Brand Dungarees, Inc. v. Marcel Fashions Group, Inc., 590 U.S. 405 (2020)

Docusign Envelope ID: 0F8EB316-EC25-8124-8137-FF9B00714B93

Staehr v. Hartford Financial Services Group, Inc., 547 F.3d 406 (2d Cir. 2008)

Storey v. Cello Holdings, L.L.C., 347 F.3d 370 (2d Cir. 2003)

TechnoMarine SA v. Giftports, Inc., 758 F.3d 493 (2d Cir. 2014)

In re Bose Corp., 580 F.3d 1240 (Fed. Cir. 2009)

**Statutes and Rules**

15 U.S.C. Section 1064

15 U.S.C. Section 1114

15 U.S.C. Section 1115

15 U.S.C. Section 1119

15 U.S.C. Section 1125(a)

Fed. R. Civ. P. 8

Fed. R. Civ. P. 9(b)

Fed. R. Civ. P. 12(b)(6)

Fed. R. Civ. P. 12(d)

Fed. R. Civ. P. 12(f)

Fed. R. Civ. P. 15

## PRELIMINARY STATEMENT

Defendants' Motion should be denied insofar as it seeks dismissal of this entire action with prejudice because it repeatedly collapses legally and factually distinct concepts, featured guest performance, association, registration, and proprietary ownership, into a single proposition.

They are not synonymous.

Plaintiff does not dispute that Defendant Freedom Williams performed as a featured guest rapper and featured guest performer on certain C+C Music Factory recordings.

Docusign Envelope ID: 0F8EB316-EC25-8124-8137-FF9B00714B93

Plaintiff likewise acknowledges that Freedom Williams Entertainment, LLC became the recorded owner of federal Registration No. 4,775,972.

But neither proposition, standing alone, answers the central historical question:

What legally cognizable event, transaction, agreement, assignment, or other transfer gave Williams proprietary rights in the C+C Music Factory identity superior to the rights Plaintiff alleges were created and retained by Robert Clivilles and David Cole?

Defendants identify no assignment from Clivilles or Cole. No sale. No written conveyance transferring the C+C Music Factory identity from Clivilles or Cole to Williams.

Plaintiff's alleged chronology is important.

Plaintiff alleges that before Williams recorded any rap for Gonna Make You Sweat (Everybody Dance Now!), Clivilles had already created the underlying music, directed and recorded the principal female vocal material, prepared an early version of the recording, presented the recording to Trilogy, and begun developing the recording as part of a producer-driven project.

After Trilogy declined the recording, Plaintiff alleges that he developed the broader C+C Music Factory concept as a producer-driven music factory centered upon Clivilles and Cole and utilizing changing featured guest performers.

Plaintiff further alleges that the recording was being presented within the recording industry before a featured guest rapper had even been selected.

Williams was subsequently selected by Clivilles to participate as a featured guest rapper and featured guest performer.

Docusign Envelope ID: 0F8EB316-EC25-8124-8137-FF9B00714B93

The chronology alleged by Plaintiff therefore separates creation of the recording and development of the C+C Music Factory concept from Williams's subsequent participation.

That distinction is reinforced by the parties' preexisting contractual relationship. Months before C+C Music Factory was launched, the January 23, 1990 written recording agreement separately identified Cole and Clivilles Music Enterprises as the company and Frederick Williams p/k/a Freedom Williams as the artist providing recording services.

Plaintiff further alleges that the original recording and C+C Music Factory concept preceded the September 13, 1990 CBS/Sony recording agreement and that the original recording had already been created and financed before Sony became contractually involved.

Thus, according to Plaintiff's chronology:

*creation of the recording, development of the producer-driven C+C Music Factory concept, presentation of the recording to the industry, selection of Williams as a featured guest rapper, Sony recording agreement.*

A featured guest performance is not itself an assignment.

Participation in recordings as a featured guest performer is not itself a conveyance of trademark ownership.

Plaintiff further alleges that the historical course of conduct continued to distinguish Williams's featured guest performance role from proprietary authority. In the late 1990s, according to Plaintiff, Williams approached Clivilles concerning Williams's desire to perform and tour in connection with C+C Music Factory, asked for permission, and asked what financial arrangement Clivilles would require.

Plaintiff responded that he would require a 50/50 arrangement.

No agreement was reached, and Plaintiff alleges that he never granted the requested authorization.

Plaintiff does not contend that this conversation, standing alone, conclusively determines trademark ownership. It is relevant, however, to the parties' course of conduct and to Williams's alleged contemporaneous understanding of whether he possessed independent authority to commercially exploit the C+C Music Factory identity without Clivilles's authorization.

Plaintiff further represents that recorded statements by Williams discuss that same conversation and may provide independent evidence concerning the exchange if properly authenticated and considered at the appropriate stage.

Following David Cole's death, Plaintiff alleges that his continuing authority did not arise merely from an informal assumption that he could take over the identity.

Plaintiff alleges that a written settlement agreement with representatives of David Cole's Estate expressly addressed Plaintiff's continuing rights concerning the commercial use and exploitation of C+C Music Factory.

Plaintiff further alleges continuous commercial exploitation from 1990 through 2026 through recordings, sales, streaming, royalty accounting, licensing, synchronization uses, publishing administration, catalog exploitation, digital services, and continuing business relationships involving Sony Music and Warner Chappell Music Publishing.

Accordingly, Plaintiff's theory is not simply that Williams once performed for Clivilles and Cole.

Plaintiff alleges a chronological and documentary history beginning before Williams's participation, continuing through the Sony relationship, continuing after Williams ceased

Docusign Envelope ID: 0F8EB316-EC25-8124-8137-FF9B00714B93

participating in the C+C Music Factory project, and continuing after David Cole's death pursuant to written governing documents and decades of commercial exploitation.

The consequences of Defendants' alleged later use are not merely historical.

Plaintiff alleges that in 2026 Williams used a social-media platform presented to the public under the C+C Music Factory identity to disseminate an approximately seven-minute video containing Williams's individual political, racial, profane, and provocative statements.

Plaintiff alleges that the video received more than six million views and subsequently became the subject of extensive national and international media coverage.

Plaintiff does not ask this Court to evaluate Williams's political opinions.

The relevance is source, affiliation, authorization, consumer perception, and resulting injury.

Plaintiff alleges that members of the public directed anger toward C+C Music Factory and threatened to withdraw support from, cease following, and cease listening to or streaming the C+C Music Factory catalog because of statements Plaintiff neither made nor authorized.

Plaintiff further alleges that the controversy continues through new trademark-prosecution activity.

On July 22, 2026, Freedom Williams Media Group, Inc. filed a new federal application for C and C MUSIC FACTORY, Serial No. 50007728, seeking registration on the Principal Register in International Class 025 and identifying Registration No. 4775972 as a claimed related registration.

That application constitutes another concrete post-2018 event that the prior TTAB proceeding could not itself have adjudicated.

Docusign Envelope ID: 0F8EB316-EC25-8124-8137-FF9B00714B93

Plaintiff nevertheless does not ask the Court to disregard the TTAB judgment.

Plaintiff asks the Court to give that judgment precisely the preclusive effect controlling law requires, and no more.

A dismissal with prejudice may carry claim-preclusive consequences.

But the TTAB did not conduct a trial resulting in affirmative factual findings that Williams created C+C Music Factory, that Clivilles or Cole assigned the identity to Williams, or that Williams's featured guest performance conveyed proprietary ownership.

Defendants themselves state in ECF No. 8 that they seek judicial notice only of the records' existence, authenticity, contents, filing and registration dates, ownership information, procedural history, and current registration status and do not ask the Court to accept disputed factual assertions, legal arguments, or evidentiary conclusions as true.

That limitation matters.

Performance establishes performance. Registration carries the statutory consequences Congress assigned to registration. Neither, without the necessary legal and factual bridge, permits disputed historical facts to be treated as though they were affirmatively adjudicated when they were not.

Even if individual claims require amendment or particular historical claims are precluded, Defendants have not established entitlement to dismissal of this entire action with prejudice.

## LEGAL STANDARD

To survive Rule 12(b)(6), a complaint must contain sufficient factual matter, accepted as true, to state a plausible claim for relief. Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009); Bell Atlantic

Docusign Envelope ID: 0F8EB316-EC25-8124-8137-FF9B00714B93

Corp. v. Twombly, 550 U.S. 544, 570 (2007).

The Court accepts well-pleaded factual allegations as true and draws reasonable inferences in Plaintiff's favor.

Affirmative defenses may be resolved at the pleading stage where the facts necessary to establish the defense are apparent from the face of the complaint and materials properly considered by the Court. See Staehr v. Hartford Financial Services Group, Inc., 547 F.3d 406, 425-26 (2d Cir. 2008).

Judicial notice of the existence and procedural history of government records does not necessarily authorize acceptance of disputed factual assertions contained within those records for their truth.

Where matters outside the pleadings are considered, Rule 12(d) governs conversion and requires the parties a reasonable opportunity to present pertinent material.

## ARGUMENT

### I. DEFENDANTS CONFLATE FEATURED GUEST PERFORMANCE, REGISTRATION, AND PROPRIETARY OWNERSHIP

Defendants' Motion moves from Williams's participation in C+C Music Factory recordings, to the later federal registration, to a conclusion concerning superior historical ownership.

Those are separate propositions.

Plaintiff does not dispute Williams's performance history.

Docusign Envelope ID: 0F8EB316-EC25-8124-8137-FF9B00714B93

Williams performed as a featured guest rapper and featured guest performer on certain C+C Music Factory recordings.

But performance establishes performance.

It does not, standing alone, identify an assignment, sale, transfer, or conveyance of proprietary rights from Clivilles or Cole to Williams.

Likewise, federal registration carries significant statutory consequences.

Plaintiff does not ask the Court to disregard them.

But registration does not retroactively create an assignment that never occurred or transform disputed historical assertions into factual findings that were never adjudicated.

The question therefore is not whether Williams performed on commercially successful C+C Music Factory recordings.

He did.

The question is whether his featured guest performance, together with the later registration and TTAB judgment, establishes as a matter of law that Plaintiff possesses no legally cognizable claim concerning C+C Music Factory.

It does not.

## II. PLAINTIFF ALLEGES AN AFFIRMATIVE HISTORICAL AND DOCUMENTARY BASIS FOR HIS CLAIMED RIGHTS

### A. The Recording Predated Williams's Participation

Docusign Envelope ID: 0F8EB316-EC25-8124-8137-FF9B00714B93

Plaintiff alleges that in the summer of 1990, before the September 13, 1990 CBS/Sony agreement concerning C+C Music Factory, Clivilles created the music and developed the original recording that became Gonna Make You Sweat (Everybody Dance Now!).

According to Plaintiff, he created the music first and thereafter hired Martha Wash to perform vocal material for the recording.

Plaintiff alleges that he directed the vocal session, demonstrated vocal material, directed the performance of the chorus, and thereafter prepared an early version of the recording.

At that stage, according to Plaintiff, the recording contained the underlying musical production and female vocal portions but did not yet contain Williams's subsequent rap performance.

Plaintiff alleges that he originally intended the recording for Trilogy, a group he had signed to produce and record.

After Trilogy declined the song because its members believed the recording was inconsistent with their preferred musical direction, Plaintiff continued developing the recording.

These alleged events preceded Williams's participation in the recording.

**B. Creation and Meaning of C+C Music Factory**

Plaintiff alleges that after Trilogy declined the recording, he initially considered developing the material as part of a Robert Clivilles producer/DJ project featuring different featured guest performers.

At approximately the same period, David Cole was pursuing his own solo recording activity.

Plaintiff alleges that he then developed a broader concept through which he and Cole could contribute material to a producer-driven project utilizing changing featured guest performers.

Docusign Envelope ID: 0F8EB316-EC25-8124-8137-FF9B00714B93

It was in connection with that project, Plaintiff alleges, that he conceived the name C+C Music Factory.

The two C's represented Clivilles and Cole.

Accordingly, Plaintiff alleges that C+C Music Factory meant the Clivilles and Cole Music Factory.

Plaintiff alleges that Music Factory reflected a producer-driven concept through which Clivilles and Cole could create recordings featuring different featured guest performers, including established performers, contemporary performers, and emerging talent.

Under the structure Plaintiff alleges, featured guest performers could change from recording to recording without changing the underlying C+C Music Factory identity.

Plaintiff relies upon the broader history of producer-driven recording projects only for the limited proposition that changing featured guest vocalists or featured guest performers are not inherently inconsistent with a continuing producer or production identity.

The ultimate rights in C+C Music Factory must be determined from the evidence concerning C+C Music Factory itself.

**C. The Recording Was Developed and Presented Before a Featured Guest Rapper Was Selected**

Plaintiff alleges that he began presenting Gonna Make You Sweat within the recording industry before a featured guest rapper had been selected.

At that stage, according to Plaintiff, the recording consisted principally of the instrumental production and female vocal portions.

Docusign Envelope ID: 0F8EB316-EC25-8124-8137-FF9B00714B93

Plaintiff alleges that the recording was presented to industry representatives, including Bruce Carbone at PolyGram Records, and ultimately reached Columbia/Sony personnel.

Plaintiff alleges that the original recording had already been created and financed through Clivilles and Cole resources before Sony entered into the September 13, 1990 recording agreement.

Accordingly, Plaintiff alleges that Sony did not create the underlying recording, create the C+C Music Factory concept, or supply Williams as the creator of the project.

**D. Williams Had a Separate Recording Relationship Before C+C Music Factory**

The January 23, 1990 Memorandum of Exclusive Recording Agreement predates the creation and launch of C+C Music Factory.

That agreement identifies Cole and Clivilles Music Enterprises as the company and Frederick Williams p/k/a Freedom Williams as the artist providing recording services.

Plaintiff alleges that the agreement was executed on behalf of Cole and Clivilles Music Enterprises by Clivilles and Cole and separately by Williams as the artist.

Plaintiff therefore alleges that Williams already had a defined artist relationship with Cole and Clivilles Music Enterprises months before C+C Music Factory was created and launched.

The agreement does not itself establish every later question concerning C+C Music Factory, but it provides contemporaneous evidence of the preexisting contractual relationship between the parties.

Plaintiff alleges that the agreement contains no assignment to Williams of the later-created C+C Music Factory identity.

**E. Williams Was Subsequently Selected as a Featured Guest Rapper**

Plaintiff alleges that he knew Williams before C+C Music Factory and had previously utilized him as a featured guest performer on other recordings.

After Trilogy declined Gonna Make You Sweat and as Plaintiff developed the C+C Music Factory concept, Plaintiff alleges that he selected Williams as one of the featured guest performers.

According to Plaintiff, Clivilles contacted Williams, explained the C+C Music Factory concept as a project involving Clivilles and Cole and changing featured guest performers, and offered Williams an opportunity to participate as a featured guest rapper and featured guest performer.

Williams accepted.

Accordingly, Plaintiff alleges that Williams's participation resulted from Clivilles's selection and invitation after the recording and producer-driven project were already in development.

Plaintiff does not dispute Williams's performances.

Plaintiff disputes Defendants' attempt to convert Williams's featured guest performance role into proprietary ownership of C+C Music Factory or its name.

**F. Control Over Featured Guest Personnel**

Plaintiff alleges that he possessed authority to select featured guest performers for C+C Music Factory recordings and to replace featured guest performers.

Plaintiff further alleges that he exercised primary creative and artistic control over the project with David Cole as his partner.

According to Plaintiff, Clivilles and Cole exercised control over the artistic direction of C+C Music Factory and participated in decisions concerning recordings, releases, and marketing within their contractual relationship with Sony.

Plaintiff alleges that featured guest performers did not obtain ownership or managerial control over C+C Music Factory merely by participating in particular recordings.

This alleged control structure is consistent with Plaintiff's producer-driven-project theory and with the changing featured guest personnel reflected across the C+C Music Factory albums.

### G. The Sony Agreement Followed the Alleged Creation and Initial Financing

Plaintiff alleges that the September 13, 1990 CBS/Sony agreement concerning C+C Music Factory was executed after Clivilles had created the original recording, developed the C+C Music Factory concept, and financed the original recording through Clivilles and Cole resources.

Plaintiff therefore does not rely upon Sony to establish the creation of C+C Music Factory.

Rather, Plaintiff alleges that the C+C Music Factory project and its initial recording existed before the Sony contractual relationship.

The Sony agreement is nevertheless relevant because Plaintiff alleges that its structure recognizes and distinguishes the roles of Clivilles and Cole and does not identify an assignment from Clivilles or Cole transferring the C+C Music Factory identity to Williams.

## III. THE CONTEMPORANEOUS CONTRACTUAL HISTORY DOES NOT IDENTIFY A TRANSFER TO WILLIAMS

**A. January 23, 1990 Agreement**

The January 23, 1990 agreement documents Williams's preexisting recording relationship with Cole and Clivilles Music Enterprises.

It identifies the company and Williams as artist in separate contractual capacities.

Plaintiff alleges that nothing in that agreement transfers to Williams ownership of the subsequently developed C+C Music Factory identity.

**B. Featured Guest Performance Is Not Proprietary Assignment**

Williams's participation on C+C Music Factory recordings as a featured guest rapper and featured guest performer does not itself establish that Clivilles or Cole transferred proprietary ownership of C+C Music Factory to him.

Plaintiff alleges that no assignment, sale, or conveyance to Williams occurred.

A court determining the parties' respective rights must therefore examine the legally relevant evidence rather than equating featured guest performance with ownership.

**C. September 13, 1990 CBS/Sony Agreement**

The September 13, 1990 CBS/Sony agreement provides additional contemporaneous evidence concerning the C+C Music Factory recording relationship.

Plaintiff alleges that the agreement recognizes and distinguishes the roles of Robert Clivilles and David Cole in ways relevant to the structure and control of the project.

Nothing identified by Defendants establishes a transfer by Clivilles or Cole of the C+C Music Factory identity to Williams.

Docusign Envelope ID: 0F8EB316-EC25-8124-8137-FF9B00714B93

Participation is not assignment. A contractual description of a performer's capacity is not, without more, a conveyance of trademark ownership.

## IV. THE THREE-ALBUM HISTORY DEMONSTRATES CHANGING FEATURED GUEST PERSONNEL WHILE C+C MUSIC FACTORY CONTINUED

The three principal C+C Music Factory studio albums illustrate Plaintiff's alleged producer-driven structure.

The 1990 Gonna Make You Sweat album utilized featured guest performers including Freedom Williams as a featured guest rapper, Zelma Davis as a featured guest vocalist, Martha Wash as a featured guest vocalist, Deborah Cooper as a featured guest vocalist, and other featured guest performers and musical contributors.

The 1994 Anything Goes! album utilized a substantially different collection of featured guest performers, including Zelma Davis, Martha Wash, Trilogy, El General, Will Downing, Audrey Wheeler, Cindy Mizelle, Danny Madden, Tony Terry, and Joey Kid.

Williams was no longer participating.

C+C Music Factory nevertheless continued.

The 1995 C+C Music Factory album again utilized different featured guest personnel, including Vic Black, A.S.K. M.E., Greg Nice, Charlie Brown, and Doug Phat.

The featured guest performers changed. C+C Music Factory continued.

This history does not itself decide trademark ownership.

Docusign Envelope ID: 0F8EB316-EC25-8124-8137-FF9B00714B93

It supports Plaintiff's factual allegation concerning the structure of the project and demonstrates why Williams's featured guest performance cannot automatically be treated as dispositive proof of ownership.

## V. PLAINTIFF'S DECLARATION AND OTHER WITNESS DECLARATIONS CORROBORATE THE ALLEGED HISTORICAL CHRONOLOGY

Plaintiff's declaration provides firsthand testimony concerning the creation and development chronology alleged in the Complaint and addressed in this Opposition.

Plaintiff states from personal knowledge that he created the underlying music and original production that became Gonna Make You Sweat; directed the early vocal recording; presented the recording to Trilogy; continued developing the recording after Trilogy declined it; developed the C+C Music Factory producer-driven concept; conceived the C+C Music Factory name as representing Clivilles and Cole; presented the recording within the industry before a featured guest rapper had been selected; subsequently selected Williams as a featured guest rapper and featured guest performer; and exercised creative authority over the selection of featured guest personnel.

Plaintiff's declaration further addresses the January 23, 1990 recording relationship with Williams, the chronology preceding the September 13, 1990 Sony agreement, Plaintiff's continuing authority after David Cole's death, continuous commercial exploitation of C+C Music Factory, and the later conversation in which Plaintiff alleges Williams sought permission to tour in connection with C+C Music Factory.

Additional declarations from Larry Flick, Zelma Davis, Randy Duran Ramos, and Angel DeLeon address overlapping portions of that chronology.

Larry Flick addresses his contemporaneous reporting concerning C+C Music Factory, his 1993 interview with Williams during Williams's solo career, and subsequent reporting concerning the continuing C+C Music Factory project.

Zelma Davis provides participant testimony concerning her engagement as a featured guest vocalist and featured guest performer, the producer-driven structure explained to her, the roles of Clivilles and Cole, Williams's role as a featured guest rapper, and later events potentially relevant to Williams's understanding of the C+C Music Factory identity.

Randy Duran Ramos and Angel DeLeon provide firsthand testimony concerning the period preceding Williams's participation and their recollections concerning the development of Gonna Make You Sweat and the subsequent C+C Music Factory concept.

Plaintiff does not ask the Court to resolve disputed historical facts in his favor merely because declarations have been submitted.

Nor does Plaintiff rely upon the declarations to circumvent Rule 12(b)(6).

They identify and preserve evidence corroborating the historical allegations and demonstrate that matters Defendants seek to treat as conclusively established are disputed factual matters supported by identifiable witnesses and documents.

If consideration of any declaration would constitute consideration of matters outside the pleadings, Plaintiff respectfully requests that the Court exclude that material for purposes of Rule 12(b)(6) rather than convert the Motion without the notice and reasonable opportunity contemplated by Rule 12(d).

## VI. THE 2018 TTAB JUDGMENT SHOULD RECEIVE ITS PROPER PRECLUSIVE EFFECT AND NO MORE

Docusign Envelope ID: 0F8EB316-EC25-8124-8137-FF9B00714B93

Plaintiff does not contend that the TTAB dismissal with prejudice is meaningless.

Claim preclusion and issue preclusion, however, are distinct.

Issue preclusion generally concerns an issue actually litigated and determined and essential to the prior judgment. See B&B; Hardware, Inc. v. Hargis Industries, Inc., 575 U.S. 138 (2015).

The TTAB proceeding ended after Plaintiff failed to prosecute the cancellation proceeding through trial.

The TTAB did not conduct a trial and affirmatively find that Williams created C+C Music Factory, originated the designation, received an assignment from Clivilles or Cole, or acquired ownership because of his featured guest performance.

A procedural judgment may carry claim-preclusive consequences without manufacturing factual findings never actually made.

Defendants themselves expressly limit their judicial-notice request to the records' existence, authenticity, contents, filing and registration dates, ownership information, procedural history, and registration status and state that they do not ask the Court to accept disputed factual assertions, legal arguments, or evidentiary conclusions as true.

The Court should hold Defendants to that limitation.

Likewise, Defendants' characterization that Plaintiff abandoned and conceded the prior action should be confined to the procedural consequences of the dismissal.

Failure to prosecute is not itself an evidentiary admission that every disputed historical allegation advanced by the opposing party was true.

Docusign Envelope ID: 0F8EB316-EC25-8124-8137-FF9B00714B93

## VII. MATERIALLY POST-2018 CONDUCT REQUIRES SEPARATE ANALYSIS

In Lucky Brand Dungarees, Inc. v. Marcel Fashions Group, Inc., 590 U.S. 405, 413-15 (2020), the Supreme Court explained that claim preclusion generally does not bar claims predicated on events postdating the earlier complaint and recognized the significance of later conduct presenting different operative facts.

Plaintiff alleges materially subsequent conduct here, including Defendants' alleged 2026 use of the C+C Music Factory designation in recordings, social media, marketplace activity, and trademark prosecution.

Those later facts require separate analysis.

### A. Williams's 2026 Use of the C+C Music Factory Identity

In 2026, Williams published an approximately seven-minute video containing individual political, racial, profane, and provocative statements.

Plaintiff alleges that Williams did not confine that communication to a personal platform identified solely as Freedom Williams.

Published reporting identified the video as having appeared through a C+C Music Factory social-media account.

Plaintiff further alleges that the video received more than six million views.

Plaintiff does not ask this Court to evaluate whether Williams's political opinions were right, wrong, appropriate, or inappropriate.

The relevant issue is not what Williams was entitled to say personally. The relevant issue is the identity through which he allegedly chose to say it.

Docusign Envelope ID: 0F8EB316-EC25-8124-8137-FF9B00714B93

Plaintiff alleges that C+C represents Clivilles and Cole and that Williams participated in certain C+C Music Factory recordings as a featured guest rapper and featured guest performer.

Plaintiff further alleges that Williams was not authorized by Plaintiff to speak for Clivilles, Cole, or C+C Music Factory or to attribute his individual political positions to them.

Section 43(a) addresses uses likely to cause confusion concerning affiliation, connection, association, origin, sponsorship, or approval. 15 U.S.C. Section 1125(a)(1)(A).

Plaintiff alleges that the 2026 incident produced this type of source and affiliation problem.

**B. National and International Dissemination, Public Confusion, and Alleged Injury to Goodwill**

Plaintiff alleges that the approximately seven-minute video received more than six million views, dramatically expanding the audience exposed to Williams's statements through the C+C Music Factory identity.

Plaintiff intends to support that allegation through contemporaneous screenshots and other evidentiary materials documenting the view count and manner in which the video was presented.

The incident became the subject of substantial national and international media attention.

Plaintiff's evidentiary materials identify coverage associated with nationally and internationally distributed media outlets.

The significance is not merely the quantity of coverage.

The manner in which Williams was publicly identified is relevant to the attribution problem Plaintiff alleges.

Some coverage associated Williams directly with C+C Music Factory. Other coverage distinguished Williams from Clivilles and Cole.

Plaintiff alleges that these differing public descriptions illustrate potential confusion concerning identity, source, affiliation, association, sponsorship, approval, and authority.

Published reporting identified the video as having been posted through a C+C Music Factory Instagram account.

Accordingly, Plaintiff alleges that the attribution problem did not arise solely from descriptions subsequently selected by third-party media organizations.

It allegedly began with Williams's use of a social-media platform presented under the C+C Music Factory identity.

National and international media then amplified the controversy.

Plaintiff alleges that members of the public directed criticism not merely toward Williams individually but toward C+C Music Factory, including statements threatening to stop following, supporting, listening to, or streaming C+C Music Factory recordings.

Plaintiff alleges that he consequently was required publicly to disassociate himself and C+C Music Factory from Williams's individual statements.

Authenticated audience comments may be relevant to how members of the consuming public understood the source, affiliation, or authorization of Williams's communication.

Docusign Envelope ID: 0F8EB316-EC25-8124-8137-FF9B00714B93

Plaintiff does not contend that isolated social-media comments, standing alone, establish the amount of damages or widespread economic loss.

Rather, Plaintiff alleges that those reactions, considered together with the identity of the account, the alleged dissemination, subsequent media coverage, Plaintiff's corrective statements, and other admissible evidence may demonstrate actual confusion or threatened injury to goodwill.

Plaintiff alleges that C+C Music Factory goodwill has been developed over decades through recordings, performances, licensing, streaming, catalog exploitation, and continuing relationships with listeners.

Where a listener believes Williams is speaking for C+C Music Factory, resulting reaction may be directed toward the C+C Music Factory catalog and goodwill rather than Williams alone.

The chronology is independently significant.

The TTAB proceeding terminated in 2018.

The alleged C+C-branded publication, dissemination, resulting media coverage, alleged consumer reaction, and alleged injury occurred in 2026.

The earlier TTAB proceeding therefore could not itself have adjudicated those subsequently occurring marketplace facts.

Finally, Plaintiff does not rely upon the political content of Williams's statements to establish liability.

The same source-identification and affiliation issue would exist regardless of the political viewpoint Williams expressed.

Docusign Envelope ID: 0F8EB316-EC25-8124-8137-FF9B00714B93

The issue is whether Williams allegedly used the disputed C+C Music Factory identity in a manner that caused members of the consuming public to associate his individual statements with C+C Music Factory and whether that use caused legally cognizable confusion or injury.

**C. The July 22, 2026 C+C Music Factory Application Constitutes Additional Post-2018 Conduct**

Plaintiff's present claims are not confined to circumstances existing when the prior TTAB proceeding terminated in 2018.

On July 22, 2026, Freedom Williams Media Group, Inc. filed a new federal trademark application for C and C MUSIC FACTORY, Serial No. 50007728, seeking registration on the Principal Register in International Class 025.

The USPTO record identifies the application as LIVE/PENDING and identifies Registration No. 4775972, the existing C and C MUSIC FACTORY registration central to the present dispute, as a registration whose ownership is claimed in connection with the new application.

This filing occurred approximately eight years after termination of the prior TTAB proceeding and constitutes a separate post-2018 event.

The significance of the application is not that filing a trademark application, standing alone, establishes liability.

It does not.

Its significance is that a legally distinct entity associated with Williams has sought additional federal trademark protection concerning C+C Music Factory while the parties' underlying rights remain disputed.

Docusign Envelope ID: 0F8EB316-EC25-8124-8137-FF9B00714B93

Plaintiff alleges that C+C Music Factory originated with Robert Clivilles and David Cole; that C+C represents Clivilles and Cole; that Williams participated in certain C+C Music Factory recordings as a featured guest rapper and featured guest performer; and that neither Clivilles nor Cole assigned, sold, conveyed, or otherwise transferred Plaintiff's rights in C+C Music Factory to Williams or any Defendant.

Plaintiff further alleges that written partnership and governing documents establish Plaintiff's continuing rights.

The July 22, 2026 application did not exist when the TTAB proceeding terminated on June 25, 2018.

The TTAB therefore could not have adjudicated the filing or legal consequences of an application submitted approximately eight years later.

The new application seeks federal protection for the same C and C MUSIC FACTORY designation and identifies Registration No. 4775972, the registration upon which Defendants substantially rely in their present Motion.

Plaintiff does not contend that the mere filing of Serial No. 50007728 establishes that the application is invalid, fraudulent, or unlawful.

Rather, Plaintiff submits the application as objective evidence that the controversy is continuing and developing through conduct occurring long after the 2018 TTAB proceeding.

Whatever claim-preclusive consequences attach to the earlier judgment must be determined according to governing law and the actual scope of the prior proceeding.

They should not be expanded into a determination of the legal consequences of materially subsequent conduct that did not yet exist.

Docusign Envelope ID: 0F8EB316-EC25-8124-8137-FF9B00714B93

## VIII. REGISTRATION AND INCONTESTABILITY DO NOT RESOLVE EVERY QUESTION PRESENTED BY THIS ACTION

Defendants rely heavily upon Registration No. 4,775,972 and its asserted incontestable status.

Plaintiff does not ask the Court to disregard the statutory consequences of registration or incontestability.

Sections 1115, 1064, and 1119 must be applied according to their actual terms.

Registration carries significant statutory and evidentiary consequences, but it does not automatically eliminate every separate claim involving later marketplace conduct, false designation, contractual rights, or a properly pleaded statutory challenge.

## IX. DEFENDANTS' SECTION 43(a) ARGUMENT IS OVERBROAD

Defendants contend that Plaintiff lacks standing because Williams's entity possesses the registration.

That does not automatically dispose of Section 1125(a).

Under Lexmark International, Inc. v. Static Control Components, Inc., 572 U.S. 118 (2014), a plaintiff invoking Section 1125(a) must fall within the statute's zone of interests and demonstrate injury proximately caused by the alleged violation.

Section 43(a) is not categorically limited to federal registrants.

Plaintiff alleges commercial injury resulting from allegedly unauthorized representations and uses of the C+C Music Factory identity, including alleged 2026 confusion concerning source, affiliation, sponsorship, and authorization.

Docusign Envelope ID: 0F8EB316-EC25-8124-8137-FF9B00714B93

Those allegations must be evaluated under Section 1125(a)'s actual requirements.

## X. LIMITATIONS AND LACHES REQUIRE CLAIM-SPECIFIC ANALYSIS

The Lanham Act does not contain a general federal limitations period for the claims at issue.

Courts may consult analogous state periods in analyzing laches, but that is not equivalent to automatically imposing the state period as a federal statute of limitations. See Conopco, Inc. v. Campbell Soup Co., 95 F.3d 187 (2d Cir. 1996).

Plaintiff also alleges conduct occurring in 2026.

Later acts cannot simply be treated as though they occurred years earlier.

State-law claims likewise require claim-specific analysis.

A New York contract claim generally accrues when the alleged breach occurs, not merely when the agreement was originally executed.

## XI. COUNT I, TRADEMARK INFRINGEMENT

Plaintiff recognizes that Defendants possess the disputed federal registration and that this affects the proper formulation of a Section 1114 claim.

Plaintiff nevertheless alleges proprietary rights and challenges Defendants' asserted entitlement to use the registration against him.

If Count I requires greater specificity concerning Plaintiff's ownership status or the relationship between the registration and Plaintiff's asserted rights, those issues are capable of clarification through amendment rather than dismissal of the entire action with prejudice.

Docusign Envelope ID: 0F8EB316-EC25-8124-8137-FF9B00714B93

## XII. COUNT II, FALSE DESIGNATION OF ORIGIN

Section 43(a) is not confined to registered trademark owners.

Plaintiff alleges that Defendants' use of C+C Music Factory falsely represents origin, sponsorship, affiliation, or authorization and causes commercial injury.

The alleged 2026 social-media incident provides a concrete example of the type of source and affiliation confusion Plaintiff claims.

Under Lexmark, those allegations should be evaluated according to Section 1125(a)'s actual requirements rather than a categorical registration-ownership rule.

## XIII. COUNT III, CANCELLATION

Plaintiff acknowledges that Count III presents the most direct claim-preclusion issue arising from the 2018 TTAB cancellation proceeding.

The Court should determine precisely which cancellation grounds are precluded by the earlier judgment.

But even if a particular cancellation theory is precluded, that conclusion does not establish that Williams historically created C+C Music Factory, that Plaintiff assigned his rights to Williams, or that materially later marketplace conduct is immunized from separate claims.

Nor does resolution of Count III necessarily require dismissal of every other count.

## XIV. COUNT IV, FRAUD ON THE USPTO

Docusign Envelope ID: 0F8EB316-EC25-8124-8137-FF9B00714B93

Fraud on the USPTO must satisfy Rule 9(b) and the demanding intent requirements applicable to trademark-prosecution fraud. See In re Bose Corp., 580 F.3d 1240 (Fed. Cir. 2009).

To the extent the existing pleading does not identify with sufficient particularity the representation, speaker, timing, falsity, knowledge, and intent underlying this claim, Plaintiff respectfully requests leave to amend.

Plaintiff does not ask the Court to infer fraud merely because Defendants obtained a registration.

Plaintiff alleges that the parties' historical relationship, Williams's preexisting recording agreement, Williams's alleged featured guest role, Plaintiff's alleged absence of any assignment to Williams, and Williams's alleged later request for authorization are potentially relevant to Williams's knowledge.

But the ultimate fraud inquiry must focus upon the precise representations made to the USPTO, their alleged falsity, the speaker's knowledge, and the required intent.

## XV. COUNT V, UNFAIR COMPETITION

Defendants' proposition that only the federal registrant may assert unfair competition is overbroad.

Plaintiff alleges that Defendants commercially exploited an identity originating with Clivilles and Cole and misrepresented authorization or affiliation.

Those allegations should be evaluated under the elements of the applicable claim rather than rejected solely because Defendants possess the disputed registration.

## XVI. COUNT VI, UNJUST ENRICHMENT

Plaintiff alleges that Defendants obtained commercial benefits through use of the C+C Music Factory identity to which Plaintiff claims continuing rights.

If greater specificity is required concerning the benefit received, connection between the parties, or inequity of retention, Plaintiff requests leave to amend.

Dismissal with prejudice is not warranted merely because Defendants dispute Plaintiff's underlying rights.

## XVII. COUNT VII, COMMON-LAW FRAUD

Common-law fraud requires an actionable misrepresentation, falsity, knowledge, intent, justifiable reliance, and damages.

To the extent Count VII duplicates Plaintiff's USPTO-fraud theory or fails to identify a distinct actionable misrepresentation made to Plaintiff upon which Plaintiff relied, amendment may be necessary.

If the deficiency is curable, the appropriate remedy is amendment rather than dismissal of the entire action with prejudice.

## XVIII. COUNT VIII, DEFAMATION

Plaintiff recognizes that controversial political speech, profanity, or disagreement over trademark ownership does not automatically constitute defamation.

A traditional defamation claim requires an actionable false factual statement concerning Plaintiff together with the other elements required by applicable law.

Docusign Envelope ID: 0F8EB316-EC25-8124-8137-FF9B00714B93

Accordingly, Plaintiff does not contend that Williams's political opinions themselves became defamatory merely because Plaintiff disagreed with them or because members of the public found them offensive.

The 2026 video is independently relevant, however, to Plaintiff's allegations concerning false association, false affiliation, attribution of authorization, actual public confusion, reputational injury, damage to goodwill, and materially post-2018 marketplace conduct.

Plaintiff alleges that Williams used a C+C Music Factory-branded platform for his individual communication and that members of the public consequently attributed or associated Williams's conduct with C+C Music Factory.

Plaintiff further alleges that the dissemination exceeded six million views, substantially increasing the potential reach of the alleged attribution and resulting reputational consequences.

If the video contains specific false factual statements concerning Plaintiff or falsely represents that Williams spoke with Plaintiff's authorization, those statements should be analyzed according to their precise language and the cause of action to which they properly relate.

To the extent Count VIII requires greater specificity concerning a particular false factual statement, speaker, publication, falsity, fault, and resulting injury, Plaintiff respectfully requests leave to amend rather than dismissal with prejudice.

## XIX. COUNT IX, BREACH OF CONTRACT

Defendants' limitations argument concerning the January 23, 1990 agreement requires identification of the particular contractual obligation allegedly breached and the date of the alleged breach.

Docusign Envelope ID: 0F8EB316-EC25-8124-8137-FF9B00714B93

Under New York law, a contract claim generally accrues when the breach occurs.

The age of the agreement therefore does not itself determine when every alleged breach occurred.

Plaintiff alleges that Williams's later conduct violated continuing contractual obligations arising from the agreement.

If greater specificity is required concerning the operative provision, continuing obligation, particular breach, and date, Plaintiff requests leave to amend.

## XX. BIG MAC ENTERTAINMENT, LLC

Defendants contend that the Complaint insufficiently identifies conduct attributable to Big Mac Entertainment, LLC.

If the Court concludes that the Complaint presently groups Defendants together too broadly, that is a pleading issue capable of correction.

Plaintiff requests leave to identify specifically the releases, distributions, representations, and commercial conduct attributable to Big Mac Entertainment, LLC rather than dismissal with prejudice.

## XXI. RULE 8 DOES NOT WARRANT DISMISSAL WITH PREJUDICE

Defendants characterize the Complaint as a shotgun pleading.

Their Motion nevertheless demonstrates that they understand Plaintiff's principal allegations, the disputed registration, TTAB history, contractual dispute, and requested relief.

Docusign Envelope ID: 0F8EB316-EC25-8124-8137-FF9B00714B93

Moreover, Defendants themselves state that if their dismissal-with-prejudice theories fail, they seek Rule 8 dismissal with leave to amend.

If greater clarity is required, Plaintiff should be permitted to provide it.

## XXII. THE ATTORNEY-FEE REQUEST DOES NOT SUPPORT DISMISSAL

Whatever fee issues may ultimately arise, they do not establish that Plaintiff's substantive claims must be dismissed at the pleading stage.

The merits of the claims and the availability of a fee award are analytically distinct.

The Court therefore need not resolve a potential fee award to determine whether Plaintiff has stated claims or should receive leave to amend.

## XXIII. DISPUTED HISTORICAL FACTS SHOULD NOT BE RESOLVED AGAINST PLAINTIFF UNDER RULE 12(b)(6)

Defendants' theory depends upon treating several disputed propositions as established: that Williams's featured guest participation constituted ownership; that the registration conclusively establishes the entire historical ownership narrative; that the TTAB dismissal affirmatively determined disputed historical facts; and that subsequent conduct is necessarily immunized by the prior proceeding.

Those propositions do not follow automatically from materials properly considered on a motion to dismiss.

The central question remains:

Docusign Envelope ID: 0F8EB316-EC25-8124-8137-FF9B00714B93

What legally cognizable event, transaction, agreement, assignment, or transfer gave Williams proprietary rights superior to the rights Plaintiff alleges were created and retained by Clivilles and Cole?

Plaintiff alleges that no such transfer occurred.

Defendants may dispute that allegation.

But a factual dispute is not the same thing as a pleading defect, and judicial notice cannot be used to resolve disputed historical facts beyond the proper scope of the noticed materials.

## XXIV. PLAINTIFF ALLEGES A DOCUMENTED BASIS FOR HIS CONTINUING RIGHTS AND CONTINUOUS COMMERCIAL USE

The named Plaintiff is Robert Clivilles individually.

Plaintiff alleges that C+C Music Factory arose from the partnership and creative enterprise of Robert Clivilles and David Cole and that neither Clivilles nor Cole assigned, sold, conveyed, or otherwise transferred Plaintiff's rights in C+C Music Factory to Freedom Williams.

No agreement identified by Defendants transferred Plaintiff's rights in C+C Music Factory to Williams, Freedom Williams Entertainment, LLC, Big Mac Entertainment, LLC, or another Defendant.

### A. Written Agreement Following David Cole's Death

David Cole died in 1995.

Plaintiff alleges that issues concerning the parties' jointly conducted business interests were thereafter addressed through a written settlement agreement between Plaintiff and

Docusign Envelope ID: 0F8EB316-EC25-8124-8137-FF9B00714B93

streaming and digital exploitation; royalty accounting and payments; licensing of recordings and compositions; synchronization licensing for motion pictures, television, and other media; greatest-hits and catalog exploitation; continued dealings with Sony Music; publishing activity

Docusign Envelope ID: 0F8EB316-EC25-8124-8137-FF9B00714B93

representatives of David Cole's Estate.

Plaintiff alleges that the written agreement expressly addressed his continuing rights concerning the commercial use and exploitation of C+C Music Factory.

Accordingly, Plaintiff does not allege that his continuing authority following Cole's death arose merely from an informal assumption that he could take over the C+C Music Factory identity.

Plaintiff alleges a written documentary basis for his continuing rights.

The agreement itself provides the best evidence of its precise terms and legal effect.

**B. Plaintiff Alleges No Transfer to Williams**

Plaintiff alleges that at no time did he transfer his rights in C+C Music Factory to Williams.

Plaintiff further alleges that neither he nor Cole granted Williams ownership of C+C Music Factory.

Following Cole's death, Plaintiff alleges that he never authorized Williams to take over, control, or commercially exploit C+C Music Factory as though Williams possessed ownership independent of Plaintiff.

**C. Continuous Commercial Exploitation**

Plaintiff further alleges that there was no cessation of the commercial exploitation of C+C Music Factory.

According to Plaintiff, from 1990 through 2026 the C+C Music Factory catalog continued to be commercially represented and exploited through sales and distribution of recordings;

What legally cognizable event, transaction, agreement, assignment, or transfer gave Williams proprietary rights superior to the rights Plaintiff alleges were created and retained by Clivilles and Cole?

Plaintiff alleges that no such transfer occurred.

Defendants may dispute that allegation.

But a factual dispute is not the same thing as a pleading defect, and judicial notice cannot be used to resolve disputed historical facts beyond the proper scope of the noticed materials.

## XXIV. PLAINTIFF ALLEGES A DOCUMENTED BASIS FOR HIS CONTINUING RIGHTS AND CONTINUOUS COMMERCIAL USE

The named Plaintiff is Robert Clivilles individually.

Plaintiff alleges that C+C Music Factory arose from the partnership and creative enterprise of Robert Clivilles and David Cole and that neither Clivilles nor Cole assigned, sold, conveyed, or otherwise transferred Plaintiff's rights in C+C Music Factory to Freedom Williams.

No agreement identified by Defendants transferred Plaintiff's rights in C+C Music Factory to Williams, Freedom Williams Entertainment, LLC, Big Mac Entertainment, LLC, or another Defendant.

### A. Written Agreement Following David Cole's Death

David Cole died in 1995.

Plaintiff alleges that issues concerning the parties' jointly conducted business interests were thereafter addressed through a written settlement agreement between Plaintiff and

Docusign Envelope ID: 0F8EB316-EC25-8124-8137-FF9B00714B93

representatives of David Cole's Estate.

Plaintiff alleges that the written agreement expressly addressed his continuing rights concerning the commercial use and exploitation of C+C Music Factory.

Accordingly, Plaintiff does not allege that his continuing authority following Cole's death arose merely from an informal assumption that he could take over the C+C Music Factory identity.

Plaintiff alleges a written documentary basis for his continuing rights.

The agreement itself provides the best evidence of its precise terms and legal effect.

**B. Plaintiff Alleges No Transfer to Williams**

Plaintiff alleges that at no time did he transfer his rights in C+C Music Factory to Williams.

Plaintiff further alleges that neither he nor Cole granted Williams ownership of C+C Music Factory.

Following Cole's death, Plaintiff alleges that he never authorized Williams to take over, control, or commercially exploit C+C Music Factory as though Williams possessed ownership independent of Plaintiff.

**C. Continuous Commercial Exploitation**

Plaintiff further alleges that there was no cessation of the commercial exploitation of C+C Music Factory.

According to Plaintiff, from 1990 through 2026 the C+C Music Factory catalog continued to be commercially represented and exploited through sales and distribution of recordings;

Docusign Envelope ID: 0F8EB316-EC25-8124-8137-FF9B00714B93

streaming and digital exploitation; royalty accounting and payments; licensing of recordings and compositions; synchronization licensing for motion pictures, television, and other media; greatest-hits and catalog exploitation; continued dealings with Sony Music; publishing activity involving Warner Chappell Music Publishing; online and social-media presence; and continued public and commercial representation of C+C Music Factory.

Plaintiff alleges that Gonna Make You Sweat (Everybody Dance Now!) and the broader C+C Music Factory catalog have continued to be commercially exploited throughout the world.

Plaintiff further alleges that, separately from Sony's administration and exploitation of sound recordings, he continued conducting business as songwriter and publisher in connection with relevant compositions, including participation in synchronization approvals where his contractual approval was required.

Plaintiff alleges that Sony accounting and licensing records, Warner Chappell publishing records, royalty statements, synchronization records, catalog releases, streaming records, and related business documents are capable of corroborating that commercial history.

**D. Plaintiff Alleges No Abandonment**

Plaintiff alleges that C+C Music Factory did not disappear when David Cole died.

The recordings remained commercially available.

The catalog continued generating royalties.

The recordings and compositions continued being licensed.

C+C Music Factory music continued being streamed and sold.

Sony continued commercially exploiting recordings under the C+C Music Factory identity.

Docusign Envelope ID: 0F8EB316-EC25-8124-8137-FF9B00714B93

Publishing rights continued being administered and exploited.

Plaintiff alleges that he continued participating in licensing and other commercial activity concerning the catalog.

Accordingly, Plaintiff alleges that he did not intentionally discontinue use of C+C Music Factory with an intention not to resume use.

To the contrary, Plaintiff alleges continuing commercial activity.

Whether that evidence ultimately satisfies the governing legal standard is a matter for application of the law to the developed factual record, not a basis for treating Defendants' contrary historical characterization as an undisputed fact on a Rule 12(b)(6) motion.

**E. Williams's Alleged Request for Permission Is Relevant to the Parties' Course of Conduct**

Plaintiff further alleges that in the late 1990s Williams approached Clivilles concerning Williams's desire to perform and tour in connection with C+C Music Factory.

According to Plaintiff, Williams asked Clivilles for permission and asked what financial arrangement Clivilles would require.

Plaintiff responded that he would require a 50/50 arrangement.

Plaintiff alleges that Williams did not accept the proposal, no agreement was reached, and Plaintiff never granted the requested authorization.

Plaintiff does not contend that this conversation, standing alone, conclusively establishes trademark ownership as a matter of law.

It is relevant, however, to the parties' historical course of conduct and to Williams's alleged contemporaneous understanding of whether he possessed independent authority to commercially exploit C+C Music Factory without Clivilles's authorization.

Plaintiff further represents that recorded interviews contain Williams's own discussion of this interaction.

If properly authenticated and admissible, those statements may provide evidence independent of Plaintiff's recollection concerning the substance of the conversation.

**F. Plaintiff Asserts Rights in His Individual Capacity**

Plaintiff alleges that following David Cole's death and the subsequent written agreement with representatives of Cole's Estate, Plaintiff continued exercising the rights granted or recognized under that agreement concerning C+C Music Factory.

Plaintiff further alleges that he personally continued conducting business associated with the C+C Music Factory name and catalog, including participation in licensing, royalty accounting, dealings with Sony and Warner Chappell, approvals where contractually required, and commercial representation of C+C Music Factory.

Plaintiff therefore asserts rights in his individual capacity rather than merely asserting rights that belonged exclusively to David Cole or Cole's Estate.

The written Estate agreement, subsequent course of conduct, continuing commercial exploitation, Sony accounting and licensing records, Warner Chappell records, synchronization approvals, streaming and catalog history, Williams's alleged statements concerning his request for permission, and related records constitute the documentary and testimonial evidence Plaintiff identifies in support of that position.

Plaintiff affirmatively alleges that he did not transfer those rights to Williams or authorize Williams to assume ownership or control of C+C Music Factory.

To the extent the Court determines that the Complaint should identify the governing documents, contractual provisions, or legal effect of those instruments with greater specificity, Plaintiff respectfully requests leave to amend.

## XXV. ALTERNATIVELY, PLAINTIFF SHOULD BE GRANTED LEAVE TO AMEND

If the Court concludes that any claim is insufficiently pleaded, Plaintiff respectfully requests leave to amend.

Rule 15 embodies a liberal amendment policy where deficiencies may be cured through greater factual specificity. See Loreley Financing (Jersey) No. 3 Ltd. v. Wells Fargo Securities, LLC, 797 F.3d 160 (2d Cir. 2015); Cuoco v. Moritsugu, 222 F.3d 99 (2d Cir. 2000).

Plaintiff can, if required, amend to specify the written documents establishing Plaintiff's continuing rights; the particular conduct attributable to each Defendant; the operative contractual provisions and alleged breaches; the materially post-2018 acts supporting particular claims; the particular allegedly false representations supporting any USPTO-fraud theory; the elements and representations underlying any common-law fraud theory; the particular false factual statements underlying any viable defamation theory; and the precise statutory and factual basis for each requested form of relief.

Plaintiff can further specify the chronology of the creation and initial financing of Gonna Make You Sweat; development of the C+C Music Factory concept before Williams's participation; Williams's preexisting January 23, 1990 recording agreement; Williams's subsequent selection as a featured guest rapper and featured guest performer; the alleged late-1990s request for authorization; Plaintiff's continuing commercial activity; and the documents and records

Docusign Envelope ID: 0F8EB316-EC25-8124-8137-FF9B00714B93

supporting Plaintiff's alleged chain of continuing rights.

These matters are capable of being pleaded with greater specificity and supported through identifiable documents and witnesses.

This is particularly appropriate because Defendants themselves request, in the alternative, Rule 8 dismissal with leave to amend.

Accordingly, any curable pleading deficiency should result in amendment rather than wholesale dismissal of the action with prejudice.

## CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that the Court:

DENY Defendants' Motion insofar as it seeks dismissal of this entire action with prejudice;

give the 2018 TTAB judgment precisely the preclusive effect required by law, without converting that judgment into affirmative historical factual findings that were never made, and separately analyze claims predicated upon materially subsequent conduct;

DENY dismissal with prejudice of claims containing potentially curable pleading deficiencies; and

alternatively, grant Plaintiff leave to amend to plead with greater specificity Plaintiff's documented continuing rights, the conduct attributable to each Defendant, materially post-2018 events, the historical and documentary chronology identified above, and the factual and legal basis for each claim and requested form of relief.

Docusign Envelope ID: 0F8EB316-EC25-8124-8137-FF9B00714B93

Plaintiff respectfully requests such other and further relief as the Court deems just and proper.

Dated: 9/22/2026, 2026

Yonkers, New York

Respectfully submitted,

Signed by:

9F05C1273AB7417...

**Robert Clivilles**

Plaintiff, Pro Se

100 Sunnyside Drive

Yonkers, New York 10705

---

**CERTIFICATE OF COMPLIANCE**

Pursuant to Local Civil Rule 7.1(c), Plaintiff certifies that this memorandum complies with the applicable word limitation. The final word count shall be inserted after completion of the record citations, exhibit citations, footnotes, Table of Contents, Table of Authorities, and final formatting.

Dated: 9/22/2026, 2026

Signed by:

9F05C1273AB7417...

**Robert Clivilles**

Plaintiff, Pro Se

Docusign Envelope ID: 1B580903-554C-8E11-80FE-26CDA3F42ADB

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| ROBERT CLIVILLES, Plaintiff, -against- FREEDOM WILLIAMS, an individual; FREEDOM WILLIAMS ENTERTAINMENT, LLC; BIG MAC ENTERTAINMENT, LLC; and DOES 1 through 20, Defendants. | Case No. 1:26-cv-04981-DG-PCG DECLARATION OF ROBERT CLIVILLES IN SUPPORT OF PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS AND IN AUTHENTICATION OF EXHIBITS |

**DECLARATION OF ROBERT CLIVILLES IN SUPPORT OF PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS AND IN AUTHENTICATION OF EXHIBITS**

I, Robert Clivilles, declare as follows:

I am the Plaintiff in this action. I am the founder of C+C Music Factory and the sole authorized user of the C+C Music Factory name and brand. I make this Declaration based upon my personal knowledge and observation. If called as a witness, I could and would testify competently to the matters stated herein.

## I. THE MAY 29, 2026 VIDEO

On or about May 29, 2026, I became aware that Freedom Williams had posted a video to the Instagram account operating under the C+C Music Factory name and brand, which Williams controls through his claimed trademark rights. I personally viewed that video on or about the date it was posted.

Docusign Envelope ID: 1B580903-554C-8E11-80FE-26CDA3F42ADB

The video was approximately seven to eight minutes in length. Williams filmed and posted the video while seated on a toilet in what appeared to be his home bathroom. The video was posted publicly to the official C+C Music Factory Instagram account and was therefore broadcast globally under the C+C Music Factory name and brand.

In the video, Williams made statements invoking Adolf Hitler. He used repeated racial slurs throughout the video. He directed vulgar and sexually degrading language at members of the public. The video was posted in connection with Williams' announced participation in a concert series known as Freedom 250, organized by a public-private partnership established pursuant to an executive order issued by President Donald J. Trump shortly after his second inauguration. Freedom 250 was planning a series of concerts on the National Mall in Washington, D.C. as part of a 16-day event called the Great American State Fair, running from June 25 to July 10, 2026, designed to commemorate the 250th anniversary of the founding of the United States. Williams was announced as one of the performing artists for this government-connected celebration. The concert series became highly controversial when multiple artists withdrew, and President Trump ultimately cancelled the concert series and replaced it with a political rally. Williams posted his video in the midst of this public controversy, using the C+C Music Factory name and brand as his platform for a profanity-laced statement broadcast globally without my knowledge, consent, or authorization.

I had absolutely no warning that Williams was going to post this video. I had no input into any statement Williams made in the video. I did not authorize Williams to post the video under the C+C Music Factory name and brand. I did not authorize any of the statements made in the video. The video was posted under the C+C Music Factory brand entirely without my knowledge, consent, or authorization.

As a direct result of this video, I was forced to take immediate action to publicly disavow Williams' statements. I launched a competing official C+C Music Factory Instagram account

for the specific purpose of publicly stating that C+C Music Factory does not participate in or side with any specific political party and that the statements Williams made in the video did not represent C+C Music Factory.

The reputational damage to C+C Music Factory caused by the video was immediate and severe. C+C Music Factory was publicly associated worldwide with statements invoking Hitler, racial slurs, and sexually degrading language, without my authorization and entirely against my will.

## II. PRESERVATION AND AUTHENTICATION OF THE VIDEO

I personally viewed the video as it was publicly available on the C+C Music Factory Instagram account on or about May 29, 2026. The video depicted Freedom Williams seated on a toilet making the statements described above under the C+C Music Factory name and brand.

I am submitting with this Declaration, as Exhibit L, a true and correct copy of the video provided on a USB flash drive filed with the Court. The video on the USB drive is a true and accurate recording of what Williams posted to the C+C Music Factory Instagram account on or about May 29, 2026. I can confirm that the video accurately depicts what I personally viewed on that account on or about that date. The USB drive is labeled: Exhibit L, Video Recording, Freedom Williams C+C Music Factory Instagram Post, May 29, 2026, Clivilles v. Williams, Case No. 1:26-cv-04981-DG-PCG.

If the original video has since been removed from the C+C Music Factory Instagram account or otherwise made unavailable, the copy on the USB drive filed herewith constitutes a preserved copy of the recording as it appeared when publicly posted.

## III. PRESS COVERAGE DOCUMENTING THE CONTENT OF THE VIDEO

Docusign Envelope ID: 1B580903-554C-8E11-80FE-26CDA3F42ADB

The content of the May 29, 2026 video was widely reported by major national music and entertainment industry publications. The following press coverage independently documents and corroborates the content of the video as I personally observed it. I personally read each of these articles at or near the time of their publication and confirm that each accurately describes the content of the video.

Variety, August 18, 2026: Reported that Williams made statements invoking Adolf Hitler, used repeated racial slurs, and directed vulgar and sexually degrading language at members of the public, and that I had no warning of and no input into these statements and was forced to launch a competing official C+C Music Factory Instagram account to publicly disavow Williams' conduct.

Billboard, August 18, 2026: Reported that the video was filmed while sitting on the toilet and contained statements invoking Adolf Hitler, racial slurs, and sexually degrading language that were false, defamatory, and injurious to the reputation of the C+C Music Factory brand and to Plaintiff personally.

Rolling Stone, August 18, 2026: Described the video as the toilet video and reported that Williams made statements invoking Adolf Hitler, used repeated racial slurs, and directed vulgar and sexually degrading language at members of the public.

TMZ, May 28, 2026: Reported on the video and confirmed that I publicly stated that any political or religious shows or comments Williams makes have absolutely nothing to do with C+C Music Factory's views.

Stereogum, May 30, 2026: Reported extensively on the content of the video and published a transcription of significant portions of the video, including Williams' statements referencing Hitler, Ivan the Terrible, and Genghis Khan.

Digital Music News, August 20, 2026: Reported that Williams made statements invoking Adolf Hitler, used repeated racial slurs, and directed vulgar and sexually degrading language at members of the public, and that I was forced to launch a competing official C+C Music Factory Instagram account to publicly disavow Williams' conduct.

The Daily Show with Jon Stewart, Comedy Central, YouTube, published June 1, 2026: A segment of The Daily Show broadcast on Comedy Central and posted to The Daily Show's official YouTube channel covered the Freedom 250 concert controversy beginning at approximately the one minute eight second mark of the program, addressing the collapse of the concert lineup as multiple artists withdrew. The segment reached 5,923,317 views on YouTube as of the date of this Declaration, demonstrating the national and international public reach of the Freedom 250 controversy in which Williams appeared and made his statements under the C+C Music Factory name. The scale of that public reach directly bears upon the scope of the reputational harm caused to C+C Music Factory by Williams' conduct.

The press coverage listed above was published by nationally recognized music, entertainment, and news media outlets and accurately reflects my personal recollection of the content of the May 29, 2026 video and the scope of its public reach.

## IV. THE IMPACT ON C+C MUSIC FACTORY AND ON PLAINTIFF

The May 29, 2026 video caused immediate, severe, and ongoing damage to the C+C Music Factory name and brand and to me personally.

C+C Music Factory is a brand I built over more than three decades. It stands for a body of musical work that brought joy to millions of people worldwide. The brand has commercial value in licensing, synchronization, streaming, performances, merchandising, and catalog exploitation.

Docusign Envelope ID: 1B580903-554C-8E11-80FE-26CDA3F42ADB

Williams' video associated C+C Music Factory globally with statements invoking Hitler, repeated racial slurs, and sexually degrading language. Those associations are the opposite of everything C+C Music Factory represents. They damage the commercial value of the brand and my personal reputation as its founder.

I was powerless to prevent the posting of the video because Williams controls the C+C Music Factory Instagram account through his fraudulent trademark claim. I could not remove the video. I could not stop Williams from posting it. I could only respond by creating a competing account to publicly disavow it. That response was itself evidence of the harm: I was forced to compete for control of my own brand's public identity on social media because Williams had taken control of the brand's official account through a trademark registration I contend was obtained by fraud.

**DECLARATION UNDER PENALTY OF PERJURY**

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

9/23/2026

Executed on Signed by: ______________________________, 2026.

9F05C1273AB7417...

---

**ROBERT CLIVILLES**

Plaintiff, Pro Se

100 Sunnyside Drive

Yonkers, New York 10705

MEMORANDUM OF EXCLUSIVE RECORDING AGREEMENT
DATED AS OF JANUARY 23, 1990

1. CONTRACTING PARTIES - COLE/CLIVILLES MUSIC ENTERPRISES c/o Jonathan Blank, Esq. 342 East 78 street, New York, New York 10021 (hereinafter referred to as "Company") and FREDERICK WILLIAMS p/k/a Freedom Williams, c/o William White, Esq., 76 Saint James Place - Suite 2B, Brooklyn, New York 11238 (hereinafter referred to as "Artist").

2. TERRITORY - The World.

3. PRODUCT (INITIAL TERM) - On execution of this Agreement, Company shall record performances of Artist sufficient to constitute one (1) Twelve Inch or 12" Single (as the term is used in the record industry [it being understood that such term shall include vinyl records, cassettes and compact discs]). Company agrees to release said Twelve Inch Single within four months of its completion except that if such four month period includes the months of November and December, Company can withhold release until the following February. The Initial Term shall continue until nine (9) months after the release of the Twelve Inch Single.

4. RENEWAL TERMS - Company shall have eight (8) separate consecutive options periods. Each option shall be deemed exercised unless Company notifies Artist in writing that it intends not to exercise such option. During each option period Company shall record sufficient masters of Artist's performances to constitute one Long-Playing Record or LP (as the term is used in the record industry [it being understood that such term shall include vinyl records, cassettes and compact discs]). Each such option period shall commence upon the conclusion of the previous term and run for a period of time that continues until nine (9) months after release of the LP to be delivered during such option period. Company agrees to release said LP within four months of its delivery except that if such four month period includes the months of November and December, Company can withhold release until the following February. No option period shall be greater than eighteen (18) months.

5. ROYALTY - Conditioned upon Artist's full and faithful performance of each and all of the terms hereof, Company shall pay

Artist the following royalties in respect of records subject to this agreement:

(a) (i) A royalty of Four Percent (4%) of the suggested retail selling price for each record sold for which Company is paid in the United States for Singles and 12" Singles derived from masters required to be recorded and delivered during the Term.

(ii) A royalty of Four Percent (4%) of the suggested retail selling price for each record sold for which Company is paid in the United States for LP's derived from masters required to be recorded and delivered during the Term. Notwithstanding the foregoing, Artist royalty shall be increased to Five Percent (5%) for each LP sold in excess of 250,000 units and Five and One-Half Percent (5 1/2%) for each LP sold in excess of 500,000 units.

(iii) Notwithstanding the foregoing, for each album recorded and released after the second LP recorded and released hereunder, Artist's royalty for Singles and LPs sold in the United States shall be the greater of the amount computed pursuant to this paragraph 5 (a) (i) and (ii) or Forty per cent (40%) of Company's royalty after payment of third party producers.

(b) The royalty set forth in 5(a) above shall be computed in the same manner as Company's distributor (taking into account distributor's packaging deductions, etc.) computes Company's royalties and such royalty shall be paid on a pro rata basis in a proportion where the numerator is the royalty set forth in paragraph 5 (a) (i) or (ii) and the denominator is the base royalty Company is paid by its distributor on sales described in paragraph 5 (a) (i) or (ii) above.

(c) Company shall have the right to license the masters to third parties for record use and/or all other types of use on a flat-fee basis. Company shall credit Artist's royalty account with Thirty-Three and One-Third percent (33 1/3%) of the net amount received by Company under each such license for the first two (2) LPs recorded pursuant to this Agreement and Forty per cent (40%) for each LP recorded thereafter. Similarly Company shall credit Artist's account for Thirty-Three and One-Third per cent (33 1/3%) of all video earnings and all other earnings generated by the recordings made pursuant to this Agreement that are not calculated on a royalty basis for the first two (2) LPs recorded pursuant to this Agreement and Forty per cent (40%) for each LP recorded thereafter.

6. <u>ROYALTY COMPUTATION</u> - All royalties paid to Artist on records sold by Company shall be paid on the same basis as Company is paid by company's distributor and computed in the same manner as Company's royalties are computed by Company's distributor. Company shall account and pay any royalties owing to Artist within one hundred twenty (120) days of each June 30 and December 31 or

thirty (30) days after Company receives payment from its distributor (whichever is sooner). Artist shall have two (2) years from the date of any royalty statement to object to that statement and shall have the right to audit Company's books and records on thirty (30) days written notice not more than once per calendar year.

7. MECHANICAL ROYALTIES AND MUSIC PUBLISHING - Artist agrees to enter into a split-publishing agreement with Company's publishing designee whereby each party shall own an undivided one-half interest in all musical compositions owned or controlled by Artist that are contained on recordings released by Company or Company's designee or which are contained on recordings released which are produced by Robert Clivilles and/or David Cole. Such split-publishing agreement shall contain terms such that Artist is paid seventy-five per cent (75%) of the net earnings (net earnings shall be gross earnings less all usual costs and expenses as are customary in the music business) from such controlled compositions (as the term is customarily used in the record industry) and Company is paid twenty-five per cent (25%) of the net earnings. Artist's and Company's publishing entities shall grant Company mechanical licenses for mechanical reproduction of records in the United States and Canada at seventy-five per cent (75%) of the statutory rate in effect on the date of release of each record. Company shall not be liable to pay to Artist mechanical royalties on any record for which it is not paid. The maximum copyright royalty for any record shall be ten (10) times the amount to be paid for each composition as set forth above.

8. CREATIVE CONTROLS - Company shall determine the material to be recorded, the producer, the album art work and all other creative decisions after consultation with Artist.

9. ADVANCES AGAINST ROYALTIES - Any and all monies paid to Artist and on Artist's behalf including all recording costs other than royalties shall be deemed Advances to Artist that shall be recoupable from any and all royalties payable to Artist pursuant to paragraph 5 hereof.

10. MANAGEMENT - Artist agrees to enter into a management agreement with Company or Company's designees provided that such agreement shall have a rate of commission of twenty per cent (20%). Notwithstanding the foregoing, no management commission shall be payable to Robert Clivilles and/or David Cole on (i) royalties paid to Artist pursuant to paragraph 5 hereof, (ii) songs published pursuant to the split publishing agreement set forth in paragraph 7 hereof, or (iii) from any of Artist's earnings from merchandise sales pursuant to the merchandise agreement set forth in paragraph 14 hereof.

11. WARRANTIES AND REPRESENTATIONS - Artist warrants and represents that Artist has the right to (a) enter into this Agreement,





JW

(b) grant all rights herein granted, (c) perform all acts herein undertaken, (d) that Artist is eighteen (18) years of age or older, and that Artist has the right to use Artist's professional name and the right to grant Company the right to use Artist's professional name. Artist further warrants and represents that Company's exercise and exploitation of the rights and materials herein granted or conveyed will not violate or infringe upon the rights of any other person, firm or corporation. Artist hereby agrees to indemnify and hold Company harmless from and against any claim (including court costs and reasonable legal fees) based upon or arising out of the breach by Artist of any of the foregoing warranties and representations.

12. <u>EXCLUSIVE SERVICES/RECORDING RESTRICTIONS</u> - During the term of this Agreement, Artist shall not enter into any agreement or make any commitment that would interfere with the performance of Artist's obligations under this Agreement and Artist shall not perform or render services in connection with the recording of phonograph records or master recordings for any person, firm or corporation other than Company. All master recordings recorded during the term of this Agreement which embody Artist's performance shall be solely owned by Company hereunder and Company shall be the sole owner of the entire worldwide copyright in and to each such master recording in perpetuity. Company shall have the same right of ownership in and to any audio-visual recordings of Artist's performance(s) rendered during the term of the Agreement. After the term of this Agreement, Artist shall not prior to the later of the following dates perform for any person, firm or corporation other than Company for the purpose of making phonograph records, master recording or audio-visual recording, any selection that was recorded under this Agreement:

a. The date five (5) years subsequent to the last date on which a master recording embodying that selection was delivered to Company under this Agreement; or

b. The date two (2) year subsequent to the date on which the term of this agreement ended.

13. <u>ARTIST'S NAME/EXCLUSIVITY</u> - Company and any person, firm or corporation designated by Company shall have the perpetual worldwide right to use and to permit others to use Artist's name (both legal and professional, and whether presently or hereafter used by Artist), likeness, other identification and biographical material concerning Artist for purposes of trade and advertising. Company shall have the further right to refer to Artist during the term hereof as Company's exclusive recording artist, and Artist shall, in Artist's activities in the entertainment field, use reasonable efforts to be billed and advertised during the term hereof as Company's exclusive recording Artist. The rights granted to Company pursuant to this paragraph with respect to Artist's name,

likeness, other identification and biographical material concerning Artist shall be exclusive during the term hereof and nonexclusive thereafter. Accordingly, but without limiting the generality of the foregoing, Artist shall not authorize or permit any person, firm or corporation other than Company to use, during the term hereof, Artist's legal or professional name or Artist's likeness in connection with the advertising or sale of phonograph records. Artist acknowledges that Company has an interest in Artist's professional name and Artist shall not perform using Artist's professional name without Company's permission. Artist hereby assigns to Company the exclusive right to use, licence, sell or otherwise convey Artist's name, professional name, likeness, photograph, biography and facsimile signature for use in merchandise of any and all kind, whether related to the record business or not, and to combine the use,licence, sale or conveyance of Artist's name, likeness, photograph, biography and facsimile signature with Artist's professional name or any logo created therefrom or to refrain from doing so. Company shall pay Artist Fifty per cent (50%) of all net proceeds from any use, licence, sale or conveyance (net proceeds shall be gross proceeds less any and all documentable costs of entering into merchandise agreements.

14. ARTIST'S OWN RECORD LABEL - Notwithstanding anything set forth in paragraphs 12 and 13 above, Artist shall have the right to use Artist's legal and professional name, biography, and likeness for trade and advertising purposes with regard to "WHITE RECORDS", the record label currently owned by Artist, provided that no such use shall violate the representations and warranties set forth herein or any representation and warranty reasonably required by Company's distributor.

15. TV TRACKS - In the event that Company creates or causes to be created TV tracks (as the term is known in the record industry) or such other recordings as may be deemed by Artist necessary to perform Tape Dates (as the term is known in the record industry), Artist shall pay Company in full compensation for the use of such recordings Ten Percent (10%) of Artist's gross revenue from such Tape Dates whether Artist uses such recordings at a particular date or dates or not. Such payment shall be made from Artist to Company on a weekly basis and the waiver, delay or failure to collect any particular fee or fees by Company shall not impair Company's right to collect other fees pursuant to this paragraph. Artist shall, each Monday, send to Company a statement showing where Artist performed, how much was earned, and remitting the amount owed Company. Company may, upon reasonable notice to Artist, examine Artist's books and records regarding Artist's performance including any and all performance contracts entered into by Artist or on behalf of Artist not more than once semi-annually.

16. UNIQUE SERVICES. - Artist expressly acknowledges that Artist's services hereunder are of a special, unique, and extraordinary

JW

character which gives them peculiar value and that if Artist breaches any term hereof, Company will be caused irreparable injury which cannot adequately be compensated by money damages. Accordingly, Company shall be entitled to seek injunctive relief, in addition to any other rights or remedies which Company may have to enforce the terms hereof.

17. FORMAL DOCUMENT. - This memorandum of agreement shall be subject to the laws of New York and shall constitute a valid and binding contract between Company and Artist unless and until superseded by formal agreements embodying such additional and customary provisions as are necessary or desirable to effectuate the purpose hereof consistently with current industry practice. The parties hereby undertake in good faith to endeavor promptly upon Company's exercise of the first option it has under this agreement to negotiate and execute such a formal agreement.

IN WITNESS WHEREOF the parties hereto this day set their hands and seals.

COLE/CLIVILLES MUSIC ENTERPRISES

BY: [signature]

BY: [signature]

ARTIST

BY: [signature]

Sony Music

51 West 52 Street
New York, New York 10019-6165

Address Correspondence To:
P.O. Box 4450
New York, New York 10101-4450
(212) 445-4321

As of June 29, 1992

Cole/Clivilles Music Enterprises
c/o Barbara Warren-Pace
71 West 23rd Street, Suite 1611
New York, New York 10010

Gentlemen:

The following, when signed by you and us (herein sometimes referred to as "Sony"), will modify the agreement between you and us dated as of September 13, 1990, relating to the recording services of Robert Clivilles, David Cole, and such other persons who constitute collectively the group p/k/a "C&C Music Factory" (CRU 90-377(1)), as it may be amended (the "Agreement"). All terms defined in the Agreement will have the same meanings in this agreement.

1. For the purposes of this paragraph 1, "you" shall also include your principals and agents (including but not limited to Robert Clivilles and David Cole). It is both the essence of this agreement and a material inducement for Sony to enter into this agreement that, promptly after the full execution hereof, you and Frederick Williams p/k/a "Freedom Williams" ("Williams") execute a settlement agreement (the "Settlement Agreement") which shall resolve all now-current or previous disputes between you and Williams. You warrant and represent that as a result of such Settlement Agreement, you shall no longer be furnishing Williams's services to Sony in any way (including as an individual recording artist or as a member of C&C Music Factory). You acknowledge that Sony has timely exercised its rights with respect to Williams's direct services as a solo recording artist pursuant to paragraph 20.02 of the Agreement and pursuant to the Artist's Assent and Guaranty appended thereto. (Notwithstanding anything to the contrary contained herein, the terms and conditions of paragraphs 2 through 4 below shall not apply unless the Settlement Agreement has been fully executed.)

2. Notwithstanding anything to the contrary contained in paragraph 3.03 of the Agreement, you shall Deliver the Overcall Album for the first Contract Period to Sony on or before January 31, 1993.

3. (a) Notwithstanding anything to the contrary contained in paragraph 6.02 of the Agreement, and as further consideration for your timely Delivery of the above Overcall Album, the Recording Fund for such Overcall Album shall be in the amount of Three Million Dollars ($3,000,000). (There shall be no other Advance payable for such Album.) Such Recording Fund shall be payable as follows: (i) Two Million Five Hundred Thousand Dollars ($2,500,000) of such Recording Fund shall be payable promptly after the full execution of each of the Settlement Agreement, this modification and a separate modification to the agreement between Williams and Sony with respect to Williams's recording services; (ii) Two Hundred Fifty Thousand Dollars ($250,000) of such Recording Fund shall be payable promptly following our receipt of your accurate notice that you have commenced recording such Album; and (iii) the balance of such Recording Fund shall be payable promptly following the timely Delivery of such Album. You shall be responsible for paying the Recording Costs of such Album in accordance with paragraph 5.01 of the Agreement.

(b) Two Million Five Hundred Thousand Dollars ($2,500,000) of such Recording Fund shall be fully recoupable in accordance with paragraph 14.11 of the Agreement. The remaining Five Hundred Thousand Dollars ($500,000) shall also be fully recoupable in accordance with paragraph 14.11 of the Agreement, except that such $500,000 sum shall not be recoupable from royalties attributable to sales of the first Album of the first Contract Period.

4. Notwithstanding anything to the contrary contained in subparagraph 9.01(a) of the Agreement, the royalty rates for USNRC Net Sales of each Album subsequent to the first Album under the Agreement will be 34% for the first 500,000 USNRC Net Sales of the Album concerned; 35%, rather than 34%, for the next 500,000 units of USNRC Net Sales of such Album; and 36% for USNRC Net Sales of such Album in excess of 1,000,000 units. The provisions of this paragraph 4 shall not apply (i.e., the applicable royalty rates will remain as originally set forth in the Agreement) if Sony notifies you that such Overcall Album for the first Contract Period is late in being Delivered and you fail to Deliver such Album in accordance with the terms of the Agreement within thirty (30) days of your receipt of such notice.

5. Reference is made to the license of the Controlled Composition entitled "GONNA MAKE YOU SWEAT (EVERYBODY DANCE NOW)" to Clairol Corporation for use in television advertisements. You and we hereby agree, that notwithstanding anything to the contrary contained in paragraph 3 above, in complete settlement of any claims Sony may have under paragraph 12.05 of the Agreement with respect to such licensing, we shall deduct the sum of Thirty Eight Thousand Seven Hundred and Fifty Dollars ($38,750) from the execution payment set forth in section 3(a)(i) hereof; provided, however, we shall nevertheless have the right to recoup the full amount of the $3,000,000 Recording Fund for the Overcall Album concerned (including the full amount of such execution payment) from royalties under the Agreement and hereunder, as set forth in such paragraph 3.

6. Except as expressly set forth in this agreement, all of the terms and conditions of the Agreement will remain in full force and effect.

Very truly yours,

SONY MUSIC, A Group of
Sony Music Entertainment Inc.

BSA By ______________
Ron Wilcox
Senior Vice President
Business Affairs and Administration

COLE/CLIVILLES MUSIC ENTERPRISES

By ______________

ASSENTED TO:

______________
ROBERT CLIVILLES

______________
DAVID COLE

**THIS AGREEMENT** made the 4th day of October, 1996, between ROBERT CLIVILLES ("Clivilles"), the Estate of David Cole (the "Estate"), HOUSE OF SOUND, INC. ("HOS"), PASSAIC ESCAPE, INC. ("Passaic"), RED INSTRUCTIONAL MUSIC, INC. ("Red Instructional"), ROBBIE-RECK, INC. ("Robbie-Reck"), and ROBI-ROB MUSIC, INC. ("Robi-Rob"),

**WITNESSETH:**

WHEREAS, David Cole ("Cole") and Clivilles were engaged together in various musical and other artistic endeavors, many of which were conducted through a partnership known as Cole/Clivilles Music Enterprises ("CCME"); and

WHEREAS, Cole died on January 24, 1995, a resident of Passaic, New Jersey; and

WHEREAS, Cole's Last Will and Testament was duly admitted to probate by the Surrogate's Court of Passaic County, New Jersey, on April 19, 1995, and Letters Testamentary thereon were duly issued on that date to Barbara Warren, the Executrix named in said Will (the "Executrix"); and

WHEREAS, HOS is a corporation formed under the laws of the State of New York for the purposes of constructing, owning and operating a recording studio located at 40 West 13th Street, New York, N.Y. (the "West 13th Street property"); and

WHEREAS, Passaic is the owner of the West 13th Street property; and

WHEREAS, Cole was the sole owner of Passaic at the time of his death, and the Estate is now the sole owner of Passaic; and

WHEREAS, at the time of Cole's death Cole and Clivilles were each fifty percent (50%) owners of the stock of HOS; and

WHEREAS, Cole and Clivilles were parties to a Shareholders' Agreement dated August 23, 1994 (the "HOS Shareholders' Agreement"); and

WHEREAS, the Estate and Clivilles desire to settle their respective obligations under the Shareholders' Agreement; and

WHEREAS, at the time of Cole's death HOS was indebted to Chemical Bank in the principal amount of Two Million Dollars ($2,000,000) (the "HOS loan"), which loan was jointly and severally guaranteed by Cole and Clivilles, individually, and Passaic, CCME, Red Instructional and Robi-Rob; and

WHEREAS, HOS' accountant has determined that HOS had a negative value at the time of Cole's death and that, accordingly, no payment was due the Estate in redemption of Cole's shares in HOS; and

WHEREAS, Clivilles and HOS have asserted certain claims against the Estate and Passaic, including an action currently pending under Index No. 102268/96 in the Supreme Court of the State of New York, County of New York; and

WHEREAS, Clivilles has caused a Mechanics' Lien to be placed against the West 13th Street Property, filed in the County Clerk's Office, New York County, on February 6, 1996; and

WHEREAS, the parties hereto wish to resolve all differences that have arisen between them upon the terms and conditions hereinafter set forth,

NOW, THEREFORE, in consideration of the premises and of the mutual covenants herein contained the parties hereto do hereby agree as follows:

ARTICLE I

Releases

(A) Clivilles, HOS, Robbie-Reck and Robi-Rob do hereby release, discharge and forgive any and all claims that they might currently have or hereafter acquire against Cole, the Estate, Barbara Warren, as Executrix, Passaic or Red Instructional, in consideration of the payments to or for the benefit of Clivilles described in Article II (A) of this Agreement and the delivery to HOS of the lease described in Article II (B) hereof. Without limiting the generality of the foregoing, Clivilles, HOS, Robbie-Reck and Robi-Rob do hereby specifically release, discharge and forgive any and all claims that they might now have or hereafter acquire against Cole, the Estate, the Executrix, Passaic and/or Red Instructional, or any other entity owned in whole or in part by any of them, with regard to: (1) the HOS loan; (2) any equipment leases owned by HOS; (3) any and all expenses incurred by Clivilles and/or HOS with regard to the construction, renovation and repair of the West 13th Street property, including but not limited to any obligations to LJ&A Development Corp.; (4) any and all expenses incurred by Clivilles and/or HOS with regard to the installation of the HOS air conditioning system and any litigation



NEWY01A:111733:9:09/09/96
25118-1

relating thereto, including but not limited to any obligations to LJ&A Development Corp.; (5) any and all claims Clivilles and/or any entity controlled by him might have with regard to the so-called Japan Project; (6) any and all claims Clivilles and/or any entity controlled by him might have with regard to Clivilles' use of the HOS studio, including but not limited to his work with MCA; (7) any and all claims Clivilles and/or any entity controlled by him might have with regard to Clivilles' work with Rebecca Ryan or Valerie Wilson; (8) any and all claims Clivilles and/or any entity controlled by him might have with regard to any tort or other damages allegedly suffered by Clivilles as a result of certain actions or inactions on the part of Cole; and (9) any and all claims Clivilles and/or any entity controlled by him might have with regard to any matter, cause or thing set forth in the complaint filed in the Supreme Court, New York County, under Index No. 102268/96.

(B) Except for the obligations assumed by Clivilles, HOS, Robbie-Reck and Robi-Rob under this Agreement and under the lease referred to in Paragraph (B) of Article II hereof, the Estate, Barbara Warren, as Executrix, Passaic and Red Instructional do hereby release, discharge and forgive any and all claims that they might currently have or hereafter acquire against Clivilles, HOS, Robbie-Reck and Robi-Rob, except for any claim that they might currently have or hereafter acquire relating to any claim made by Martha Wash or the SONY Corporation or any affiliate thereof against Cole, Clivilles, CCME, Cole/Clivilles Music Enterprises and/or C&C Music Factory directly or indirectly relating to any song recorded by Wash prior to Cole's death (a "Wash claim").

(C) While the parties intend by this Agreement to resolve all issues that may have heretofore arisen or might hereafter arise among them, they recognize that there continue to be rights and obligations stemming from the relationship of Cole and Clivilles as partners of CCME. Although the CCME partnership has terminated in accordance with the CCME Partnership Agreement and is in the process of dissolution, revenues continue to flow into that entity, and CCME may have obligations to third parties that arose from CCME's activities prior



NEWY01A:111733:9:09/09/98
25118-1

to Cole's death. Moreover, under the terms of the CCME Partnership Agreement Clivilles has the right, among other things addressed in the CCME Partnership Agreement, to "continue the business of the Partnership, alone or in conjunction with others, without further obligation to the estate of the deceased co-Partner" (other than the obligation to pay royalties or other fees to the Estate, to the extent and in the manner set forth in the Partnership Agreement, on works in which Cole had an interest at the time of his death) and to use the CCME name. Accordingly, nothing herein contained shall be deemed to be a waiver of any income to which any party hereto might be entitled under the CCME Partnership Agreement; nor shall anything herein contained be deemed to relieve any party from contributing to CCME his or its *pro rata* share of any obligation CCME might have to a third party if the assets of CCME are insufficient to meet such obligation. The Estate recognizes Clivilles' right to the exclusive commercial use and exploitation of the names "CCME," "Cole/Clivilles Music Enterprises," "C&C Music Factory," "Two Puerto Ricans, a Black Man and a Dominican," and "Seduction," and Clivilles does hereby indemnify and hold the Estate, the Executrix, Passaic and Red Instructional, and any other entity owned in whole or in part by any of them, harmless against any and all claims, damages, suits, sums of money, loss of income, costs, expenses, etc. (including reasonable attorneys' fees) which they might incur in connection with any decisions made or activities conducted by Clivilles, or any other person or entity (other than the Estate or Barbara Warren) with whom or with which he shall have conducted business under said names, after the date of Cole's death. The indemnification provided for in this Article I(C) shall not apply to any claims, damages, suits, sums of money, loss of income, costs, expenses, attorneys' fees, etc. which the Estate, Executrix, Passaic and Red Instructional might incur in connection with decisions made or activities conducted (i) jointly by the Estate and Clivilles during the dissolution process and thereafter; (ii) by Warren on behalf of CCME during the period of time she served as manager of CCME and/or Executrix; or (iii) in connection with any Wash claim, as hereinabove described in Paragraph (B) of this Article I.

(D) It is understood by the parties that Barbara Warren (also sometimes known as Barbara Warren-Pace) is signing this Agreement in her capacities as Executrix of the Will of Cole and as President of Passaic and Red Instructional. Nothing herein contained shall be deemed to be a waiver of any rights or claims that Barbara Warren might have, in her individual capacity, against any of the parties hereto; nor shall anything herein contained be deemed to be a waiver by any party hereto of any rights or claims he or it might have against Barbara Warren, in her individual capacity.

(E) Nothing herein contained shall be deemed to be a release of the Estate's right to receive copies of unfinished or unreleased masters of songs written or published by Cole, in whole or in part, which are in the possession of CCME or to have reasonable access upon reasonable notice to the books and records of HOS and CCME to the extent necessary for the orderly administration of the Estate, including but not limited to information needed in connection with any audit of the Estate's tax returns.

ARTICLE II

Payments to Clivilles

(A) The Estate shall pay to Clivilles the sum of Nine Hundred Five Thousand Dollars ($905,000), said sum to be paid as follows:

(1) Three Hundred Twenty Thousand Dollars ($320,000) heretofore paid to Chemical Bank in reduction of the HOS loan. Clivilles acknowledges that of the sums heretofore paid to Chemical Bank in reduction of the HOS loan, Three Hundred Twenty Thousand Dollars ($320,000) came from funds owned by the Estate and are, therefore, properly credited against the Estate's obligation under this Article II.

(2) Five Hundred Eighty-five Thousand Dollars ($585,000) on or before the sale of the West 13th Street property. The Estate shall have the right, in its

sole and absolute discretion, to pay any portion of said sum, including the whole thereof, to Chemical Bank, but only in reduction of the HOS loan. If any portion of said sum remains unpaid as of November 1, 1996, the Estate shall pay to Clivilles simple interest on the unpaid balance at the rate set forth in CPLR §5004, but not more than one percent (1%) over the prime rate charged by Chemical Bank on that date.

(B) Simultaneously with the execution of this Agreement Passaic and HOS will enter into a lease, in the form attached hereto as Exhibit A, whereby HOS will lease the West 13th Street property from Passaic for a term of twenty (20) years commencing as of August 1, 1994. HOS shall have no obligation to pay rent prior to March 1, 1996. From and after March 1, 1996, HOS shall pay rent to Passaic in accordance with said lease. The parties acknowledge that as of August 1, 1996, Clivilles shall owe back rent of Thirty Thousand Dollars ($30,000). In lieu of the payment of said sum to Passaic, it is hereby agreed that the balance due Clivilles from the Estate under Subparagraph (2) of Paragraph (A) of this Article II shall be reduced from Five Hundred Eighty-five Thousand Dollars ($585,000) to Five Hundred Fifty-five Thousand Dollars ($555,000). Commencing as of September 1, 1996, HOS shall make the monthly rental payments required under said lease directly to Passaic.

## ARTICLE III

## House of Sound

(A) The Estate does hereby acknowledge Clivilles as the sole owner of HOS as of the date of Cole's death, with all rights and obligations attendant thereto, and does specifically acknowledge Clivilles' right to hold or dispose of the corporation and its assets in any manner that he, in his sole and absolute discretion, shall determine.

(B) Clivilles does hereby acknowledge that he is the sole owner of HOS as of the date of Cole's death and that he and/or HOS are solely responsible for all expenses relating

thereto, including but not limited to (1) all expenses of the operation of HOS; (2) any and all payments (principal or interest) on the HOS loan or any equipment leases owned by HOS; (3) all expenses relating to the HOS air conditioning system and any litigation relating thereto; and (4) any obligations to LJ&A Development Corp. relating to the construction, renovation and repair of the property leased by HOS from Passaic (but not including any obligations the Estate or Passaic might have to LJ&A Development Corp. with regard to the construction, renovation and repair of the balance of the West 13th Street property).

(C) Notwithstanding the foregoing, in the event HOS, the House of Sound lease and/or all or substantially all of HOS' assets is sold or otherwise disposed of prior to April 10, 1997 in exchange for compensation in money or money's worth in the aggregate in excess of One Million Six Hundred Thousand Dollars ($1,600,000) (the "base amount"), one-half (1/2) of the compensation in excess of the base amount shall be paid to the Estate up to a maximum payment of Three Hundred Twenty Thousand Dollars ($320,000) upon excess compensation of Six Hundred Forty Thousand Dollars ($640,000). If the compensation exceeds Two Million Two Hundred Forty Thousand Dollar ($2,240,000), such excess beyond said sum shall belong solely to Clivilles. If Clivilles should make any capital improvements to HOS after the date of this Agreement, the fair market value of such improvements shall be added to, and be included in, the base amount for purposes of calculating the amount payable to the Estate under this Paragraph (C). For example, if Clivilles should make capital improvements to HOS after the date of this Agreement having a fair market value of Two Hundred Thousand Dollars ($200,000), the Estate would not share in the proceeds of sale unless the compensation paid should exceed One Million Eight Hundred Thousand Dollars ($1,800,000); any excess beyond said sum would be shared on a fifty/fifty basis up to compensation of Two Million Four Hundred Forty Thousand Dollars ($2,440,000), and any compensation beyond $2,440,000 would belong solely to Clivilles.

## ARTICLE IV

Withdrawal of Pending Matters

(A) Upon execution of this Agreement Clivilles and HOS will execute and deliver to counsel for the defendants a stipulation dismissing, with prejudice, the action which is currently pending under Index No. 102268/96 in the Supreme Court of the State of New York, County of New York.

(B) Upon execution of this Agreement Clivilles will execute and deliver to counsel for the Estate a release of lien canceling, with prejudice, the Mechanic's Lien currently on file in the County Clerk's Office, New York County.

## ARTICLE V

Indemnification

(A) Clivilles, HOS, Robbie-Reck and Robi-Rob shall indemnify and hold the Estate, the Executrix, Passaic and Red Instructional, and any other entity owned in whole or in part by any of them, harmless against any and all claims, damages, suits, sums of money, costs, expenses, etc. (including reasonable attorneys' fees) which they might incur in connection with any matter from which they are released and discharged pursuant to the provisions of Article I hereof, including but not limited to any expenses they might incur in connection with the HOS loan or any equipment leases owned by HOS. In addition, Clivilles agrees to use his best efforts to have the Estate, Passaic and Red Instructional released from any obligations, including guarantees, that they might have on the HOS loan or equipment leases.

(B) Notwithstanding the foregoing, the parties acknowledge that there is currently pending a dispute with Chemical Bank regarding the Bank's legal fees in connection with the restructuring of the HOS loan. The parties further acknowledge that a portion of said fees relates to the mortgages on the West 13th Street property for which Passaic and/or the Estate should be liable. The parties, accordingly, do hereby agree to share such fees as follows:

(1) The Estate shall pay the sum of Four Thousand One Hundred Seventy-five Dollars ($4,175) representing the fees of the Underweiser & Underweiser firm through March 3, 1995.

(2) Clivilles shall pay all fees of the Morgan, Lewis & Bockius firm, regardless of whether incurred before or after the date of this Agreement.

(3) The balance of such fees, including the Underweiser & Underweiser fees after March 3, 1995, all in-house Chemical Bank fees and the closing fee will be paid seventy-five percent (75%) by Clivilles and twenty-five percent (25%) by the Estate.

## ARTICLE VI

## General Terms

(1) Each party agrees that upon the request of the other, or of the other's legal representatives, as the case may be, he or it shall execute, acknowledge and deliver any and all instruments appropriate or necessary to carry into effect the provisions of this Agreement.

(2) This Agreement contains the entire understanding of the parties, and no representations or promises have been made except as contained herein.

(3) Each party hereby waives any and all rights he or it may have, for any reason whatsoever, to seek any rescission of this Agreement or any modification of any term hereof.

The only manner in which this Agreement may be modified or amended is by a written instrument executed by all parties.

(4) If any provision of this Agreement should hereafter be determined to be wholly or partly unenforceable, it shall not affect the validity and enforceability of the balance of this Agreement, it being the intention of the parties that this Agreement shall be conclusive and binding upon them to the fullest extent permitted by law.

(5) This Agreement shall inure to the benefit of, and shall be binding upon, the parties hereto and their respective successors and assigns.

(6) This Agreement shall be governed by and construed in accordance with the laws of the State of New York without regard to principles of conflicts of law or any other jurisdiction's laws.

(7) This Agreement may be executed in counterpart originals, each of which shall be deemed an original and shall constitute one and the same instrument.

(8) All references to Chemical Bank hereunder shall be deemed to refer, where appropriate, to The Chase Manhattan Bank, N.A, the successor to Chemical Bank by way of merger.

## ARTICLE VII

Representations and Warranties

(1) Barbara Warren does hereby represent and warrant that she is the duly appointed Executrix of the Will of David Cole, deceased, pursuant to Letters Testamentary issued by the Surrogate's Court of Passaic County, and has full power and authority to enter into the transactions and agreements set forth in this Agreement on behalf of the Estate, and that the execution, delivery and performance of this Agreement by the Estate will not contravene or violate (a) any existing law, rule or regulation to which the Estate is subject, or (b) any judgment, order, writ, injunction, decree, or award of any court or governmental regulatory official, body or authority which is applicable to the Estate.

(2) Each of HOS, Passaic, Red Instructional, Robbie-Reck and Robi-Rob does hereby represent and warrant that the execution, delivery, and performance of this Agreement by it will not contravene or violate (a) any existing law, rule or regulation to which such corporation is subject, or (b) any judgment, order, writ, injunction, decree, or award of any court or governmental regulatory official, body or authority which is applicable to such corporation, or (c) the Certificate of Incorporation or Bylaws of such corporation or any security issued by it.

(3) Passaic does hereby represent and warrant that it has good, valid and marketable title to the West 13th Street Property.

**IN WITNESS WHEREOF,** the parties have executed this Agreement as of the date hereinabove set forth.

Robert Clivilles

ESTATE OF DAVID COLE

By Barbara Warren, Executrix

Barbara Warren, Executrix

PASSAIC ESCAPE, INC.

By Barbara Warren-Pace, Pres.

Barbara Warren, President

RED INSTRUCTIONAL MUSIC, INC.

By Barbara Warren-Pace, Pres.

Barbara Warren, President

HOUSE OF SOUND, INC.

By

Robert Clivilles, President

~~ROBBIE-RECK, INC.~~

By

Robert Clivilles, President

ROBI-ROB MUSIC, INC.

By______________________________
Robert Clivilles, President

Docusign Envelope ID: F6D154F4-893A-8E53-81CF-A22DCEC1B5CD

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| ROBERT CLIVILLES, et al., Plaintiffs, v. | Case No. 1:26-cv-04981-DG-PCG |
| FREEDOM WILLIAMS, et al., Defendants. | DECLARATION OF ZELMA DAVIS |

**DECLARATION OF ZELMA DAVIS**

I, Zelma Davis, declare as follows:

I am over eighteen years of age and make this Declaration based upon my personal knowledge, experiences, conversations, and recollection. If called as a witness, I could and would testify competently to the matters stated herein.

**MY INTRODUCTION TO C+C MUSIC FACTORY**

Sometime between approximately late August and early September 1990, I went to the home of Jamale Graves in Upper Manhattan to audition for him. I was introduced to Mr. Graves by a mutual friend.

Mr. Graves was the choreographer for Seduction, a girl group created by Robert Clivilles and David Cole.

Mr. Graves told me that Robert Clivilles and David Cole were looking for a vocalist to be a featured artist on their new record.

I sang for Mr. Graves, and he asked for some photographs of me. Approximately one week later, he arranged an audition for me with Robert Clivilles and David Cole at a studio in Manhattan.

Docusign Envelope ID: F6D154F4-893A-8E53-81CF-A22DCEC1B5CD

On the day of the audition, I met David Cole, who was sitting at a huge black baby grand piano. Robert Clivilles was not present when I initially arrived.

I sang for David Cole, and we chatted. A few minutes later, Robert Clivilles and Freedom Williams entered the studio.

David introduced Robert Clivilles as his partner and Freedom Williams as the rapper I would be performing with.

Robert told Freedom to stand next to me so that a picture could be taken of us together.

**MY CONTRACT AND ROLE AS A FEATURED ARTIST**

A few weeks later, I received a contract from Robert Clivilles and David Cole, and I was signed as a featured artist with C+C Music Factory.

My attorney and Mr. Graves informed me that Freedom Williams and I were featured artists and that we had similar contracts.

I was told exactly how many songs I would be featured on with Freedom Williams and how many I would be featured on without him.

Mr. Graves explained to me that Clivilles and Cole were doing something similar to what Quincy Jones had done by producing an album featuring different vocalists.

That explanation was consistent with my own experience working with C+C Music Factory. Different vocalists and performers were featured on different recordings.

The singles from the album identified the featured artists appearing on them.

**MY DEALINGS WITH FREEDOM WILLIAMS DURING THE FIRST ALBUM**

It was my understanding at the time that Freedom Williams had issues concerning his compensation and his management company, 23 West, and that he wanted the fourth single to be a song featuring him instead of Just a Touch of Love, which featured me.

Freedom personally asked me to convince Robert Clivilles and David Cole to change the single to one on which he appeared.

Freedom refused to appear in the music video for Just a Touch of Love.

During this same general period, Freedom asked me to stop participating in the C+C Music Factory project and to join a separate group with him. I declined.

Shortly thereafter, in approximately late 1991 or early 1992, Freedom ceased participating as a featured artist in the C+C Music Factory project.

**FREEDOM WILLIAMS' SOLO CAREER**

After Freedom Williams ceased participating as a featured guest vocalist on C+C Music Factory, he asked me to be on his solo record for Sony Music.

I met Freedom at a studio in Manhattan, and he played me the record.

Freedom asked me to sing the hook.

However, we stopped communicating shortly after that, so I did not sing the hook on his solo record, I Hear the Voice of Freedom.

**MY LATE-1990s PERFORMANCES AND CONVERSATIONS WITH FREEDOM**

In the late 1990s, Freedom approached me about doing shows together.

He had seen that Trilogy, Martha Wash, and I were touring successfully and wanted to take advantage of the second C+C Music Factory album, even though he was not on it.

He wanted me to perform songs from both the first album and the second album.

Freedom said it would not be an issue using the C+C Music Factory name.

He told me that the shows would be billed as:

**C+C Music Factory featuring Freedom Williams and Zelma Davis.**

## MY CONVERSATION WITH FREEDOM ABOUT THE C+C MUSIC FACTORY TRADEMARK

Freedom also told me that he had spoken to April Harris of Cole and Clivilles' girl group, Seduction.

Freedom said April told him that she had successfully taken the Seduction trademark from Cole and Clivilles by registering it herself.

Freedom said he was going to do the same thing with the C+C Music Factory trademark.

I remember this vividly because I did not believe that doing something like that was possible, since the group was named after Robert and David, who founded it.

I also did not think that they would allow the trademark to expire.

Freedom said he was simply waiting for the right time, for the trademark to expire.

I remember thinking:

**That will never happen.**

## MY LATER PERFORMANCES WITH FREEDOM

In the late 1990s, Freedom Williams and I did a few shows together.

Eventually, Freedom and his team told me that I should not be paid the same amount as he was. They wanted me to accept a lower fee, even though I was performing songs from the second C+C Music Factory album, which Freedom was not on.

I refused, and from that point forward I stopped doing shows with him.

Since the 1990s, Freedom and I have performed together on only one occasion that I recall, which was a free performance for the MTV Grind dancers reunion.

## ROBERT CLIVILLES' AUTHORIZATION FOR MY USE OF THE NAME

In the early 2000s, I personally asked Robert Clivilles to allow me to use the C+C Music Factory name so that I could book shows by myself.

The billing would read:

**C+C Music Factory featuring Zelma Davis.**

Robert gave me his blessing to use the C+C Music Factory name in that manner.

I asked Robert for permission because, based upon my personal history and experience with C+C Music Factory, I understood that permission to use the name was something I should obtain from Robert.

**THE 2019 KENTUCKY DERBY ENGAGEMENT**

In 2019, I booked a show associated with the Kentucky Derby as:

**C+C Music Factory featuring Zelma Davis.**

I did so pursuant to the permission Robert Clivilles had previously given me.

A few days later, my agent informed me that Freedom had contacted the promoters.

My agent told me that Freedom represented to the promoters that he was the rightful owner of the C+C Music Factory trademark, that I was not permitted to use it, and that they should hire him instead.

My agent further informed me that Freedom threatened legal action if the promoters booked me.

The promoters ultimately dropped me from the engagement and booked Freedom instead.

As a result, I lost the performance engagement I had booked using the C+C Music Factory billing with Robert's permission.

**BASIS OF MY TESTIMONY**

My relationship with C+C Music Factory began in 1990. I personally auditioned for the project, entered into an agreement to participate as a featured artist, recorded and performed in connection with the project, and interacted directly with Robert Clivilles, David Cole, and Freedom Williams.

The statements in this Declaration concerning conversations I personally had with Freedom, including what he told me about April Harris, the Seduction trademark, his intention

Docusign Envelope ID: F6D154F4-893A-8E53-81CF-A22DCEC1B5CD

concerning the C+C Music Factory trademark, and waiting for the trademark to expire, reflect my personal recollection of what Freedom told me.

The statements concerning my audition, recording activities, performances, conversations with Freedom, and my request for Robert's permission to use the C+C Music Factory name concern events in which I personally participated.

Where I have described information communicated to me by another person, including my attorney, Mr. Graves, or my agent, I have identified that information as something I was told rather than something I personally witnessed.

I make this Declaration voluntarily and based upon my own personal knowledge and recollection.

**DECLARATION UNDER PENALTY OF PERJURY**

I declare under penalty of perjury that the foregoing is true and correct.

9/21/2026

Executed on: ______________________________, 2026.

Signed by:

Zelma Davis

A1FFA39828CB410...

**ZELMA DAVIS**

9/21/2026

Date: ________________________

docusign

## Certificate Of Completion

Envelope Id: F6D154F4-893A-8E53-81CF-A22DCEC1B5CD

Status: Completed

Subject: Complete with Docusign: ATS_Clivilles_Declaration_ZelmaDavis.pdf

Source Envelope:

| | | |
|---|---|---|
| Document Pages: 7 | Signatures: 1 | Envelope Originator: |
| Certificate Pages: 1 | Initials: 0 | Henry Vargas |
| AutoNav: Enabled | | henryvargasinc@gmail.com |
| EnvelopeId Stamping: Enabled | | IP Address: 173.61.83.125 |
| Time Zone: (UTC-08:00) Pacific Time (US & Canada) | | |

## Record Tracking

| | | |
|---|---|---|
| Status: Original<br>9/21/2026 7:47:46 AM | Holder: Henry Vargas<br>henryvargasinc@gmail.com | Location: DocuSign |

| Signer Events | Signature | Timestamp |
|---|---|---|
| Zelma Davis<br>zelmadavis@gmail.com<br>Security Level: Email, Account Authentication (None) | Signed by:<br>Zelma Davis<br>A1FFA39828CB410...<br><br>Signature Adoption: Drawn on Device<br>Using IP Address: 73.230.65.71 | Sent: 9/21/2026 7:51:42 AM<br>Viewed: 9/21/2026 7:58:28 AM<br>Signed: 9/21/2026 8:06:08 AM |

**Electronic Record and Signature Disclosure:**
Not Offered via Docusign

| In Person Signer Events | Signature | Timestamp |
|---|---|---|

| Editor Delivery Events | Status | Timestamp |
|---|---|---|

| Agent Delivery Events | Status | Timestamp |
|---|---|---|

| Intermediary Delivery Events | Status | Timestamp |
|---|---|---|

| Certified Delivery Events | Status | Timestamp |
|---|---|---|

| Carbon Copy Events | Status | Timestamp |
|---|---|---|
| rob clivilles<br>robertclivilles@yahoo.com<br>Security Level: Email, Account Authentication (None) | COPIED | Sent: 9/21/2026 7:51:43 AM |

**Electronic Record and Signature Disclosure:**
Not Offered via Docusign

| Witness Events | Signature | Timestamp |
|---|---|---|

| Notary Events | Signature | Timestamp |
|---|---|---|

| Envelope Summary Events | Status | Timestamps |
|---|---|---|
| Envelope Sent | Hashed/Encrypted | 9/21/2026 7:51:43 AM |
| Certified Delivered | Security Checked | 9/21/2026 7:58:28 AM |
| Signing Complete | Security Checked | 9/21/2026 8:06:08 AM |
| Completed | Security Checked | 9/21/2026 8:06:08 AM |

| Payment Events | Status | Timestamps |
|---|---|---|

Docusign Envelope ID: 8C8B2DD7-232E-80C5-800C-A9EFFBDB007C

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| ROBERT CLIVILLES, et al., Plaintiffs, v.<br>FREEDOM WILLIAMS, et al., Defendants. | Case No. 1:26-cv-04981-DG-PCG<br>DECLARATION OF RANDY DURAN RAMOS |

## DECLARATION OF RANDY DURAN RAMOS

I, Randy Duran Ramos, declare as follows:

I am over eighteen years of age. I make this Declaration based upon my personal knowledge, firsthand experiences, and recollection. If called as a witness, I could and would testify competently to the matters stated herein.

### TRILOGY AND MY RELATIONSHIP WITH ROBERT CLIVILLES

In the summer of 1990, I was a member of the recording group Trilogy.

During that period, I worked directly with Robert Clivilles and had firsthand knowledge of his work as a songwriter, producer, arranger, and recording artist.

### THE CREATION OF GONNA MAKE YOU SWEAT (EVERYBODY DANCE NOW!)

In the summer of 1990, Robert Clivilles went into Axis Recording Studio in New York City to work on and record a proposed single for Trilogy.

During those sessions, Robert created, produced, arranged, and wrote the recording that became Gonna Make You Sweat (Everybody Dance Now!).

The recording featured the vocals of Martha Wash.

Based upon what I personally witnessed and knew at the time, Robert created the instrumental track and wrote the lyrics and vocal riffs for the recording.

Robert intentionally left two spaces in the recording for Trilogy to write and perform two rap verses.

**ROBERT PRESENTED THE RECORD TO TRILOGY**

Robert played Gonna Make You Sweat (Everybody Dance Now!) for the members of Trilogy, including Angel DeLeon and me, as a proposed first single for our group.

After hearing the recording, we told Robert that we thought the song was too pop for the direction we wanted Trilogy to pursue. We wanted something with more of a street edge.

Robert believed strongly in the recording and asked us to listen to it again because he believed it could become a major hit.

We listened to the recording a second time.

After hearing it again, we still decided that it was not the direction we wanted for Trilogy, and we asked Robert to create something different for us.

I therefore have firsthand knowledge that Gonna Make You Sweat (Everybody Dance Now!) existed and was presented to Trilogy before Trilogy declined to use it as our proposed single.

**THE CREATION OF C+C MUSIC FACTORY**

Docusign Envelope ID: 8C8B2DD7-232E-80C5-800C-A9EFFBDB007C

After Trilogy declined Gonna Make You Sweat (Everybody Dance Now!), I personally witnessed Robert develop the concept that became C+C Music Factory.

The concept involved Robert bringing together different singers, rappers, musicians, and performers to appear as featured guest artists on recordings within the C+C Music Factory project.

David Cole became involved after Robert had completed Gonna Make You Sweat (Everybody Dance Now!).

After the C+C Music Factory project moved forward, I personally witnessed Robert make decisions concerning the featured guest artists who would participate in the first C+C Music Factory project.

Freedom Williams was among the featured guest performers selected to participate in the project.

Deborah Cooper, who already had a working relationship with Robert Clivilles and David Cole, also participated, along with additional singers, rappers, musicians, and performers.

**THE STRUCTURE OF C+C MUSIC FACTORY**

Based upon my personal involvement with the project and what I witnessed from its inception, Robert Clivilles and David Cole were the creators and official members of C+C Music Factory. The other artists who appeared on the recordings participated as featured guest artists rather than as members of C+C Music Factory.

Trilogy performed background vocals in connection with the first C+C Music Factory album and later participated as featured guest vocalists on the second C+C Music Factory album.

During the period in which I was involved with C+C Music Factory, the featured performers could change from recording to recording, while Robert Clivilles and David Cole remained C+C Music Factory.

**DECLARATION UNDER PENALTY OF PERJURY**

I declare under penalty of perjury that the foregoing is true and correct.

Executed on: 9/21/2026, 2026.

DocuSigned by:
R. Dr...
D3D516A9017C432...

**RANDY DURAN RAMOS**

Date: 9/21/2026

docusign

## Certificate Of Completion

Envelope Id: 8C8B2DD7-232E-80C5-800C-A9EFFBDB007C
Subject: Complete with Docusign: ATS_Clvilles_Declaration_RandyDuranRamos.pdf
Source Envelope:

| | | |
|---|---|---|
| Document Pages: 4 | Signatures: 1 | Status: Completed |
| Certificate Pages: 1 | Initials: 0 | Envelope Originator: |
| AutoNav: Enabled | | Henry Vargas |
| EnvelopeId Stamping: Enabled | | henryvargasinc@gmail.com |
| Time Zone: (UTC-08:00) Pacific Time (US & Canada) | | IP Address: 173.61.83.125 |

## Record Tracking

| | | |
|---|---|---|
| Status: Original<br>9/21/2026 7:55:18 AM | Holder: Henry Vargas<br>henryvargasinc@gmail.com | Location: DocuSign |

| Signer Events | Signature | Timestamp |
|---|---|---|
| Randy Ramos<br>duranramos@gmail.com<br>Security Level: Email, Account Authentication (None) | <br>Signature Adoption: Drawn on Device<br>Using IP Address: 149.120.34.99<br>Signed using mobile | Sent: 9/21/2026 7:58:41 AM<br>Viewed: 9/21/2026 7:59:49 AM<br>Signed: 9/21/2026 3:19:19 PM |



**Electronic Record and Signature Disclosure:**
Not Offered via Docusign

| In Person Signer Events | Signature | Timestamp |
|---|---|---|

| Editor Delivery Events | Status | Timestamp |
|---|---|---|

| Agent Delivery Events | Status | Timestamp |
|---|---|---|

| Intermediary Delivery Events | Status | Timestamp |
|---|---|---|

| Certified Delivery Events | Status | Timestamp |
|---|---|---|

| Carbon Copy Events | Status | Timestamp |
|---|---|---|
| rob clvilles<br>robertclvilles@yahoo.com<br>Security Level: Email, Account Authentication (None) | COPIED | Sent: 9/21/2026 7:58:42 AM |

**Electronic Record and Signature Disclosure:**
Not Offered via Docusign

| Witness Events | Signature | Timestamp |
|---|---|---|

| Notary Events | Signature | Timestamp |
|---|---|---|

| Envelope Summary Events | Status | Timestamps |
|---|---|---|
| Envelope Sent | Hashed/Encrypted | 9/21/2026 7:58:42 AM |
| Certified Delivered | Security Checked | 9/21/2026 7:59:49 AM |
| Signing Complete | Security Checked | 9/21/2026 3:19:19 PM |
| Completed | Security Checked | 9/21/2026 3:19:19 PM |

| Payment Events | Status | Timestamps |
|---|---|---|

Docusign Envelope ID: F519A23A-2628-8030-817F-A1527B1DF739

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| ROBERT CLIVILLES, et al., Plaintiffs, v. FREEDOM WILLIAMS, et al., Defendants. | Case No. 1:26-cv-04981-DG-PCG DECLARATION OF ANGEL DeLEON |

## DECLARATION OF ANGEL DeLEON

I, Angel DeLeon, declare as follows:

I am over eighteen years of age. I make this Declaration based upon my personal knowledge, firsthand experiences, and recollection. If called as a witness, I could and would testify competently to the matters stated herein.

## TRILOGY AND MY RELATIONSHIP WITH ROBERT CLIVILLES

In the summer of 1990, I was a member of the recording group Trilogy.

During that period, I worked directly with Robert Clivilles and had firsthand knowledge of his work as a songwriter, producer, arranger, and recording artist.

## THE CREATION OF GONNA MAKE YOU SWEAT (EVERYBODY DANCE NOW!)

In the summer of 1990, Robert Clivilles went into Axis Recording Studio in New York City to work on and record a proposed single for Trilogy.

During those sessions, Robert created, produced, arranged, and wrote the recording that became Gonna Make You Sweat (Everybody Dance Now!).

The recording featured the vocals of Martha Wash.

Based upon what I personally witnessed and knew at the time, Robert created the instrumental track and wrote the lyrics and vocal riffs for the recording.

Robert intentionally left two spaces in the recording for Trilogy to write and perform two rap verses.

## ROBERT PRESENTED THE RECORD TO TRILOGY

Robert played Gonna Make You Sweat (Everybody Dance Now!) for the members of Trilogy, including Randy Duran Ramos and me, as a proposed first single for our group.

After hearing the recording, we told Robert that we thought the song was too pop for the direction we wanted Trilogy to pursue. We wanted something with more of a street edge.

Robert believed strongly in the recording and asked us to listen to it again because he believed it could become a major hit.

We listened to the recording a second time.

After hearing it again, we still decided that it was not the direction we wanted for Trilogy, and we asked Robert to create something different for us.

I therefore have firsthand knowledge that Gonna Make You Sweat (Everybody Dance Now!) existed and was presented to Trilogy before Trilogy declined to use it as our proposed single.

## THE CREATION OF C+C MUSIC FACTORY

After Trilogy declined Gonna Make You Sweat (Everybody Dance Now!), I personally witnessed Robert develop the concept that became C+C Music Factory.

The concept involved Robert bringing together different singers, rappers, musicians, and performers to appear as featured guest artists on recordings within the C+C Music Factory project.

David Cole became involved after Robert had completed Gonna Make You Sweat (Everybody Dance Now!).

After the C+C Music Factory project moved forward, I personally witnessed Robert make decisions concerning the featured guest artists who would participate in the first C+C Music Factory project.

Freedom Williams was among the featured guest performers selected to participate in the project.

Deborah Cooper, who already had a working relationship with Robert Clivilles and David Cole, also participated, along with additional singers, rappers, musicians, and performers.

**THE STRUCTURE OF C+C MUSIC FACTORY**

Based upon my personal involvement with the project and what I witnessed from its inception, Robert Clivilles and David Cole were the creators and official members of C+C Music Factory. The other artists who appeared on the recordings participated as featured guest artists rather than as members of C+C Music Factory.

Trilogy performed background vocals in connection with the first C+C Music Factory album and later participated as featured guest vocalists on the second C+C Music Factory album.

Docusign Envelope ID: F519A23A-2628-8030-817F-A1527B1DF739

During the period in which I was involved with C+C Music Factory, the featured performers could change from recording to recording, while Robert Clivilles and David Cole remained C+C Music Factory.

**DECLARATION UNDER PENALTY OF PERJURY**

I declare under penalty of perjury that the foregoing is true and correct.

9/21/2026

Executed on: ______________________________, 2026.

DocuSigned by:

Angel DeLeon

0EE3B1FAD805473...

**ANGEL DELEON**

9/21/2026

Date: ________________________

docusign

## Certificate Of Completion

| | | |
|---|---|---|
| Envelope Id: F519A23A-2628-8030-817F-A1527B1DF739 | | Status: Completed |
| Subject: Complete with Docusign: ATS_Clvilles_Declaration_AngelDeLeon.pdf | | |
| Source Envelope: | | |
| Document Pages: 4 | Signatures: 1 | Envelope Originator: |
| Certificate Pages: 1 | Initials: 0 | Henry Vargas |
| AutoNav: Enabled | | henryvargasinc@gmail.com |
| EnvelopeId Stamping: Enabled | | IP Address: 173.61.83.125 |
| Time Zone: (UTC-08:00) Pacific Time (US & Canada) | | |

## Record Tracking

| | | |
|---|---|---|
| Status: Original<br>9/21/2026 7:52:02 AM | Holder: Henry Vargas<br>henryvargasinc@gmail.com | Location: DocuSign |

| Signer Events | Signature | Timestamp |
|---|---|---|
| Angel DeLeon<br>Deleonyb@gmail.com<br>Security Level: Email, Account Authentication (None) | DocuSigned by:<br>Angel DeLeon<br>0EE3B1FAD805473...<br><br>Signature Adoption: Pre-selected Style<br>Using IP Address: 2a04:4e41:3784:1f0e::2084:1f0e<br>Signed using mobile | Sent: 9/21/2026 7:54:50 AM<br>Viewed: 9/21/2026 10:38:49 AM<br>Signed: 9/21/2026 10:40:37 AM |

**Electronic Record and Signature Disclosure:**
Not Offered via Docusign

| In Person Signer Events | Signature | Timestamp |
|---|---|---|

| Editor Delivery Events | Status | Timestamp |
|---|---|---|

| Agent Delivery Events | Status | Timestamp |
|---|---|---|

| Intermediary Delivery Events | Status | Timestamp |
|---|---|---|

| Certified Delivery Events | Status | Timestamp |
|---|---|---|

| Carbon Copy Events | Status | Timestamp |
|---|---|---|
| rob clvilles<br>robertclvilles@yahoo.com<br>Security Level: Email, Account Authentication (None) | COPIED | Sent: 9/21/2026 7:54:51 AM |

**Electronic Record and Signature Disclosure:**
Not Offered via Docusign

| Witness Events | Signature | Timestamp |
|---|---|---|

| Notary Events | Signature | Timestamp |
|---|---|---|

| Envelope Summary Events | Status | Timestamps |
|---|---|---|
| Envelope Sent | Hashed/Encrypted | 9/21/2026 7:54:51 AM |
| Certified Delivered | Security Checked | 9/21/2026 10:38:49 AM |
| Signing Complete | Security Checked | 9/21/2026 10:40:37 AM |
| Completed | Security Checked | 9/21/2026 10:40:37 AM |

| Payment Events | Status | Timestamps |
|---|---|---|

# Clivilles And Cole Retool C+C Music Factory

THE FACTORY GROOVES AGAIN: We recall with great clarity the first time we spoke with **David Cole** and **Robert Clivilles** about their brand new pet project, a rotating clique of up-and-coming singers and rappers called **C + C Music Factory**.

It was 1991, and the producers were handsomely decked out in oh-so-fashionable togs, chilling in the overstuffed chairs of a Columbia Records conference room, and looking every inch the dance music producers and remixers of the moment—which, in fact, they were. They had barely finished cutting tracks for their first album, yet they were already pondering the idea of international concert tours, copy-cat acts, and re-routing the direction of dance music at pop radio. Confident? Cocky? On the surface, perhaps. But as the wall-shattering command "*everybody dance now!*" fast filled dancefloors and airwaves around the world, visionary proved to be a more appropriate adjective.

It is three years later, and the mood at New York's Electric Lady recording studio is similarly positive. A lot of heavy stuff has gone down since "Gonna Make You Sweat" topped the charts, and there is immeasurable pressure surrounding the top-secret tunes-in-progress that eventually will fill the second C + C Music Factory album. As the pair sit down for their first interview in over a year, they bypass the drama and occasional bad blood, opting instead for relaxed, good-humored vibes—and, of course, that familiar bravado.

First, there is the album's vocal lineup. **Zelma Davis** has returned as the resident vamp, while longtime protégés Trilogy have stepped into the rap role vacated by **Freedom Williams**—but with a twist: They harmonize as well. The real zinger is the presence of **Martha Wash**, who has ended a lengthy, sometimes litigious fracas with Clivilles and Cole to perform on several songs.

"It was really important to me that we sit down and have a personal conversation before we got to work," Cole says. "We talked, and let our feelings out. By no means was it heated. We cleared up a lot. Five minutes later, she was in the booth wailing her butt off. It was fierce."

Wash solos on "Takin' Over," a house romp that Clivilles says could be "*the* club anthem of the summer." The track begins with a slow and soulful passage that Cole feels could stand on its own without ever breaking into the uptempo section. Wash also is featured with others on "Can You Dig," a potential single that is cast in the now-classic C + C pop/hip-hop sound, and "Do You Wanna Get Funky," another single contender that Clivilles has gleefully dubbed "a real booty song."

While the pair's reunion with Wash is sure to grab headlines, Cole and Clivilles say the real surprise of the album will be the potency of Davis' performances.

"She did her homework," Clivilles beams, pointing to her turn on the rhythmic street ballad "Take A Toke (I Got The Best Love You Ever Smoked)" as a vocal that "will surprise a lot of people. She took voice lessons, and has really grown in so many ways."

The purpose of Bronx-bred male trio Trilogy in the C + C lineup, and on jams like the jazzy "All Damn Night" and the salsa/tribal-spiced "Borriqua Anthem," as Clivilles sees it, is to bring "a harder edge to the sound. This year, rap is more real. You can't front people and get over."

Regardless of who is singing or rapping, the real glue of C + C Music Factory is the creative synergy and kinship that Cole and Clivilles share. Opposites in so many personal ways, the two spark when they work together in such a special way that they are continually looking for different projects to collaborate on. Not content to rest on the laurels of a recent Grammy win for their contributions to **Whitney Houston's** mega soundtrack to "The Bodyguard," their current agenda includes a deal with Sony Japan to launch G-Factory Records, a new dance music subsidiary that is designed to accommodate the team's prolific output.

The first release on G-Factory will be "Clivilles & Cole Nightclubbing, Volume One," an album that is split in half between the pair's remixes of nuggets by **Dr. Buzzard's Savannah Band** and new material. **Audrey Wheeler, Jocelyn Brown**, and **Debra Cooper**, the rich and belting voice on "Pride (A Deeper Love)," will appear on the set, due out in Japan May 1. At this point, there are no firm plans for either the album or G-Factory to surface in the U.S., though Cole and Clivilles are optimistic that a deal will be set shortly.

"This is the kind of album where we can get totally loose," Cole says. "It's fun for us in a way that's different than C + C Music Factory. It's music for the head." And if that is not enough, the duo also will soon focus on the long-delayed debut album by their Arista act, S.O.U.L. S.Y.S.T.E.M., with an eye toward autumn release. Front woman **Michelle Visage** has stepped out of the picture to follow solo aspirations, leaving the act to regroup with four lead singers.

"The idea is to create a more mature, song-oriented entity," Cole says. "We want it to be more along the lines of our work with **Mariah Carey** and Whitney Houston. We want this record to appeal to a wider and maybe older audience. It's our chance to further prove our versatility."

In the meantime, Cole and Clivilles are focused on completing the as-yet-untitled C + C Music Factory album, which they hope to have in stores by June.

"We've realized that the way to conquer the pressure of making another C + C album is to put it in the back of our minds and get on with actually making the record," Clivilles says. "We want to take the sound a step further and change the vibe a little, make it a little harder. Whether people dig it or not—and I think they will—we're proud of what we're doing. We're not compromising what we believe in."

## Dance Trax



*by Larry Flick*

BEATS'N'PIECES: We're bummed to note that **John Trienis** was a casualty of recent layoffs at EMI Records in New York. After a winning streak of five No. 1 club hits last year, he leaves his post as national director of dance music promotion on Tuesday (1). Trienis is mulling over several options, and expects to announce a new industry home soon. We hear that there are no plans to replace Trienis at EMI right now. With no one actively working dance music at the label, where does this leave such dance/rhythm-rooted acts as **Judy Cheeks, Eternal, Pet Shop Boys**, and **Joi**? . . . On an upbeat note, popular U.K. indie Champion Records has signed a distribution deal with EastWest in the U.S., serving its dance/crossover department a tasty plate of club morsels to dine on. First singles resulting from the deal are "Better Late Than Never" by **Lafayette** and "Love Come Home" by **Our Tribe With Franke Pharoah**, which is due out later this month. No firm word on whether the red-hot "Feel What U Want" by **Christine W.** will also be on EastWest . . . **David Morales'** sorely underappreciated debut, "The Program," gets a new lease on life later this month when Mercury unleashes the ragga-tribal anthem "In De Ghetto" to clubs. Morales did the mixes himself—and quite nicely at that. Another of the set's warmer moments, "Sunshine," is being eyed for an urban radio push . . . The "At Midnight: TK Dance Classics Remixed" collection is finally about to be issued on Fader/Chemistry Records. The album includes funky disco-era gems like "It's Been So Long" by **George McCrae**, revamped by **Judge Jules**, and "Get Down Tonight" by **K.C. & the Sunshine Band**, brilliantly re-examined by **Tom Moulton**. Heavy props to Chemistry A&R dude **Brian Chin** for his fine production choices . . . Given the massive success of **Joe Roberts'** gorgeous recent single "Lover," London/ffrr Records in the U.K. will launch a pop push behind his previous club hit, "Back In My Life," to coincide with the shipment of the singer's delicious full-length debut. London's U.S. arm is going to work the project here, but has yet to settle on a street date. Get crackin', folks! . . . Starved for something new from **Martha Wash**? In the interim between solo and **C + C Music Factory** projects, seek out the Hollywood Records film soundtrack to "D2: The Mighty Ducks," on which she offers a sassy reading of "Mr. Big Stuff." Quite fun . . . Finally, **Jody Watley's** fab new single, "When A Man Loves A Woman," is sure to nab a much larger club audience with the onset of savvy gay and lesbian remixes by **Steve Wolfe**, head of A&R at MCA Records in London. The title hook line is manipulated to say "when a man loves a man it's a beautiful thing" (with the same done for women), amid a storm of hip trance/house beats. Not only is this a boldly effective promotional move, but it is in keeping with the open-minded perspective that Watley has been known to factor into her songs.

PARTING GLANCES: Drag performer and vocalist **Peter Giles** succumbed to complications resulting from AIDS March 15 in New York.

Best known under the stage moniker **Donna Giles**, his high-pitched tones were last heard on the "Jackie 60" version of **David Morales'** 1993 club smash "Gimmie Luv." Performing and recording up to the end of his life, Giles recently completed a cover of the "Dreamgirls"/**Jennifer Holiday** track "And I Am Telling You I'm Not Going." The record, produced by **Eve Nelson** and remixed by **Stonebridge**, will be released on the independent Downtown 161 Records this month.

### Billboard. HOT Dance Breakouts

FOR WEEK ENDING APR. 2, 1994

**CLUB PLAY**

1. WORKER MAN PATRA EPIC
2. E LATOUR SMASH
3. COME ON AND DO IT FPI PROJECT MOONSHINE MUSIC
4. I WANT IT, I NEED IT (REAL LOVE) SAUNDRA WILLIAMS BOLD SOUL
5. GIVIN' IT UP INCOGNITO TALKIN' LOUD IMPORT

**MAXI-SINGLES SALES**

1. I'VE BEEN THINKING ABOUT YOU JOCELYN ENRIQUEZ CLASSIFIED
2. LOVE COMES AND GOES ED O.G. & DA BULLDOGS CHEMISTRY
3. BAKNAFFEK DAS EFX EASTWEST
4. WHAT'S UP DJ MIKO ZYX
5. RETURN TO INNOCENCE ENIGMA VIRGIN

Breakouts: Titles with future chart potential, based on club play or sales reported this week



Love & India. Enduring dance siren India, left, celebrated her recent birthday with a performance at New York's Sound Factory Bar. The highlight of the gig was a rendition of "Love & Happiness," her current hit with River Ocean on Strictly Rhythm Records. The legendary Tito Puente, right, also made a special appearance. Portions of the evening were shot for a future videoclip. (Photo: Tina Paul)

UNIQUE DISTRIBUTORS
ENTERTAINMENT IS OUR BUSINESS
STOP LOOKING !
Your 12" & LP Distributor is at your fingertips
12" PRODUCT IS OUR SPECIALTY
ALL MAJOR & INDEPENDENT LABELS
House · R+B · Rap · Dance · Alternative
HARD TO FIND 12" CLASSICS
LP'S STOCKED DAILY
CASSETTE SINGLES, CD MAXI'S, CD'S,
CASSETTES, ACCESSORIES & BLANK TAPES
110 Denton Ave. New Hyde Park, N.Y. 11040 Tel.# (516) 294-5900
Tel.# (800) 992-9011 (Outside N.Y. State) Fax# (516) 741-3584



www.americanradiohistory.com

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| ROBERT CLIVILLES, Plaintiff, -against- FREEDOM WILLIAMS, an individual; FREEDOM WILLIAMS ENTERTAINMENT, LLC; BIG MAC ENTERTAINMENT, LLC; and DOES 1 through 20, Defendants. | Case No. 1:26-cv-04981-DG-PCG DECLARATION OF LARRY FLICK PURSUANT TO 28 U.S.C. § 1746 Hon. Diane Gujarati U.S. District Judge |

**DECLARATION OF LARRY FLICK PURSUANT TO 28 U.S.C. § 1746**

I, Larry Flick, declare as follows:

## I. BACKGROUND AND BASIS OF PERSONAL KNOWLEDGE

I am over eighteen years of age and competent to make this declaration. I make this declaration based upon my personal knowledge, including interviews I personally conducted and articles I personally wrote during the period addressed below.

During the relevant years, I was a music journalist for Billboard and wrote extensively about dance music, recording artists, producers, remixers, record companies, and developments within the recording industry. My work included Billboard's Dance Trax column and direct interviews with artists, producers, and other music-industry professionals.

Through that work, I became professionally acquainted with Robert Clivilles, David Cole, C+C Music Factory, and Freedom Williams during the period in which C+C Music Factory emerged and achieved substantial commercial success. My knowledge of these events did not originate with the present litigation. I reported on these individuals and events as they were

occurring more than thirty years ago.

Three articles I wrote are particularly relevant to this declaration:

a. March 2, 1991: C&C; Music Factory Poised To Turn Out Fresh Dance Sound;

b. May 29, 1993: my Dance Trax coverage of Freedom Williams and his solo career; and

c. April 2, 1994: Clivilles And Cole Retool C+C Music Factory.

These articles constitute contemporaneous records of my reporting at three different points in the history of C+C Music Factory.

## II. 1991: THE FORMATION AND ORIGINAL CONCEPT OF C+C MUSIC FACTORY

On March 2, 1991, Billboard published my article entitled C&C; Music Factory Poised To Turn Out Fresh Dance Sound. The article was written during the early commercial success of C+C Music Factory's debut album, Gonna Make You Sweat.

In reporting the origins of C+C Music Factory, I identified producer/songwriters Robert Clivilles and David Cole as the individuals who formed C+C Music Factory. That was how I understood and reported the formation of the project in 1991.

My article also addressed an important aspect of the original C+C Music Factory concept: Clivilles and Cole intended to use different singers and rappers rather than maintain an unchanging lineup of featured vocal performers. I reported that Clivilles and Cole intended to rotate different singers and rappers on subsequent C+C Music Factory albums.

Robert Clivilles personally explained to me that they wanted the project to serve as a means of discovering and introducing new talent to the recording industry. He further explained the meaning of the Factory concept. As reflected in my contemporaneous reporting, the concept was not simply to repeat the same musical product with the same performers. Rather, the concept contemplated developing new talent and allowing different performers to participate in the project. The use of different singers and rappers was therefore a feature of the concept described to me during that period.

## III. FREEDOM WILLIAMS AND ZELMA DAVIS IN 1991

My March 1991 article specifically discussed rapper Freedom Williams and singer Zelma Davis. In that article, I described Williams and Davis in relation to Clivilles and Cole as performers Clivilles and Cole had discovered for that phase of the project. I also reported that Williams and Davis were already being prepared for separate solo albums on Columbia Records.

This was consistent with the project as it had been described to me: performers could appear on C+C Music Factory recordings while also developing individual recording careers. My 1991 reporting therefore did not describe C+C Music Factory as an unchanging lineup dependent upon the permanent participation of Freedom Williams, Zelma Davis, or any other individual featured vocalist. Rather, I reported a project formed by Robert Clivilles and David Cole in which different singers and rappers could participate as the project developed.

## IV. THE CLIVILLES AND COLE PARTNERSHIP PRECEDED C+C MUSIC FACTORY

My March 1991 article also traced the professional relationship between Robert Clivilles and David Cole before C+C Music Factory. I reported that Clivilles and Cole had formed a

professional partnership and pursued work together as producers and remixers. Their history included production, songwriting, and remix work that preceded C+C Music Factory. My article discussed their earlier work and successes, including work associated with Seduction. As reflected in my reporting, the professional and creative relationship between Clivilles and Cole existed before C+C Music Factory. C+C Music Factory subsequently developed from that existing creative and professional relationship.

## V. THE CREATIVE PURPOSE OF C+C MUSIC FACTORY

My reporting also addressed why Clivilles and Cole wanted to create C+C Music Factory. Clivilles explained that they wanted an opportunity to write and record the kind of music that excited them. C+C Music Factory provided Clivilles and Cole with an outlet for musical ideas they wanted to pursue as producers and performers, rather than limiting their activities to producing and remixing records for other artists.

The chronology I reported began with the professional and creative relationship between Clivilles and Cole and then proceeded to the development of C+C Music Factory. In other words, their partnership and creative work preceded the C+C Music Factory project.

## VI. C+C MUSIC FACTORY IS BORN

My March 1991 article also described the transition from the Clivilles and Cole production partnership to C+C Music Factory as a Columbia recording project. I reported that Clivilles and Cole were signed to Columbia Records as artists. In describing what followed, I reported that C+C Music Factory was born. That was my contemporaneous account published in Billboard in 1991.

My reporting therefore documented the following progression:

Robert Clivilles and David Cole's professional partnership;

their work as producers, songwriters, and remixers;

their opportunity to record their own music;

the formation of C+C Music Factory; and

the use of different singers and rappers within that project.

## VII. 1993: MY INTERVIEW WITH FREEDOM WILLIAMS

Approximately two years later, I personally interviewed Freedom Williams in connection with his new solo recording career. That interview was reported in my May 29, 1993 Billboard Dance Trax column. At that time, Williams was promoting himself as the solo recording artist Freedom Williams and preparing the release of his Columbia album Freedom.

In introducing Williams to Billboard's readers, I described him as an ex-C&C; Music Factory rapper. I also reported that Williams's solo career followed his split with David Cole and Robert Clivilles, whom I identified in the article as C&C; creators David Cole and Robert Clivilles. Those descriptions reflected my contemporaneous reporting at the time I interviewed Williams in 1993.

During our interview, Williams discussed what he believed he had personally contributed to the earlier C+C Music Factory project. He emphasized his talent and appearance and expressed pride in what had been accomplished. Williams then spoke about his prior C+C Music Factory period in the past tense. He told me:

**But all of that is behind me now.**

Williams immediately turned his attention toward the future and toward taking his new music as far as he could. This was not an inference formed decades later. I personally interviewed Williams while he was presenting himself to the music industry and the public as the solo recording artist Freedom Williams.

## VIII. WILLIAMS'S SEPARATE SOLO CAREER

Williams's solo project involved more than the release of a single recording. I reported that Williams had co-written and co-produced nine of the twelve tracks on his solo album. He was promoting that music to clubs and radio. Columbia was planning to put Williams on the concert circuit. Williams was assembling a band for that purpose.

The circumstances I reported in 1993 therefore differed from those I had reported in 1991. In 1991, I had reported on Clivilles and Cole forming and developing C+C Music Factory and using singers and rappers within that concept. In 1993, I was interviewing Freedom Williams as an individual solo recording artist following his separation from C+C Music Factory. Williams himself characterized his previous C+C period as behind him and expressed his intention to move forward with his new music.

## IX. 1994: C+C MUSIC FACTORY CONTINUES

On April 2, 1994, Billboard published another article I wrote concerning C+C Music Factory. The article was entitled Clivilles And Cole Retool C+C Music Factory.

At the beginning of that article, I recalled my earlier interaction with David Cole and Robert Clivilles when C+C Music Factory was new. I recalled speaking with them in 1991 about what was then their new project. In describing the original concept, I again recalled C+C Music Factory as involving a rotating collection of singers and rappers. That description was

consistent with what I had reported contemporaneously in 1991.

By 1994, the individual performers appearing within C+C Music Factory had changed. My reporting discussed performers including Zelma Davis, Trilogy, Martha Wash, and Deborah Cooper, among others, in connection with C+C Music Factory. C+C Music Factory continued recording after Freedom Williams's departure. My 1994 reporting continued to identify Robert Clivilles and David Cole at the center of the C+C Music Factory project. The changing collection of vocal performers I observed in 1994 was consistent with the rotating-performer concept I had reported in 1991.

## X. THE CHRONOLOGY REFLECTED IN MY CONTEMPORANEOUS REPORTING

Looking at these three articles together refreshes my recollection of a consistent chronology.

In 1991, I reported that Robert Clivilles and David Cole formed C+C Music Factory. I reported that an important feature of the project was the ability to use different singers and rappers. I reported that Freedom Williams and Zelma Davis were performers being developed during that phase of the project and were already being prepared for separate solo recording careers.

In 1993, I personally interviewed Freedom Williams after his separation from C+C Music Factory. I described Williams as the ex-C&C; Music Factory rapper and identified Clivilles and Cole as the C+C creators. Williams was pursuing a separate career under his own name, with his own album, promotional campaign, and plans for solo touring. Williams told me that his previous C+C period was behind him.

In 1994, I again reported on C+C Music Factory. C+C Music Factory was continuing after Williams's departure, while the singers and rappers appearing within the project had changed. These developments were consistent with the C+C Music Factory concept that I had reported from the beginning: a project formed by Clivilles and Cole that could utilize different singers

and rappers over time.

## XI. THE CONTEMPORANEOUS NATURE OF MY REPORTING

I understand that events from this period are now relevant to a dispute occurring many decades later. I am not offering an opinion concerning the ultimate legal ownership of any trademark, or any other legal conclusion reserved for the Court.

I can testify, however, concerning what I personally observed, what was said to me during interviews I conducted, what I reported contemporaneously, and how the individuals involved presented themselves to me at the time.

My articles are significant to my recollection because they were written contemporaneously with the events they describe. The March 1991 article was written while C+C Music Factory's debut project was commercially current. The May 1993 article was written while Freedom Williams was promoting his separate solo career. The April 1994 article was written while Clivilles and Cole were working on another C+C Music Factory album with a changed collection of vocal performers.

These articles were written more than three decades before the present dispute. I had no reason when writing them to characterize the participants or events for purposes of litigation that might arise decades later. I was reporting on the music industry and the individuals involved as I understood and observed them at the time.

## XII. AUTHENTICATION OF MY CONTEMPORANEOUS BILLBOARD ARTICLES

Attached as Exhibit A is a true and correct copy of my March 2, 1991 Billboard article: C&C; Music Factory Poised To Turn Out Fresh Dance Sound. I recognize the article and my byline. It accurately reflects the reporting I published at that time.

Attached as Exhibit B is a true and correct copy of my May 29, 1993 Billboard Dance Trax article concerning Freedom Williams and his solo career. I recognize the article and my byline. It accurately reflects the interview and reporting I published at that time.

Attached as Exhibit C is a true and correct copy of my April 2, 1994 Billboard article: Clivilles And Cole Retool C+C Music Factory. I recognize the article and my byline. It accurately reflects my reporting at that time.

Where this declaration describes statements personally made to me during interviews, those statements are based upon my personal involvement in the interviews and my contemporaneous published reporting. I have reviewed this declaration and the attached articles before signing it. The statements in this declaration are true and accurate to the best of my personal knowledge and recollection, refreshed where appropriate by my contemporaneous reporting. I make this declaration voluntarily.

**DECLARATION UNDER PENALTY OF PERJURY**

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on: Sept. 21, 2026 ______________________, 2026.

At: ______________________________________.

Larry Flick

______________________________________

**LARRY FLICK**

______________________________________

# Let Freedom Ring; Tales From Brave Ulysses

THE FINAL WORDS of "Voice Of Freedom," the debut solo single by **Freedom Williams**, reveal much of what you need to know about the ex-**C&C Music Factory** rapper's attitude toward the past: *"And you thought I was going to disappear?"*

That track, a rousing dance/hip-hop anthem, also is exemplary of the tone permeating Williams' upcoming **Columbia** collection, "Freedom."

Roughly one year after a bitter split with C&C creators **David Cole** and **Robert Clivilles**, the Brooklyn, N.Y., native has come out swinging, armed with tunes that employ the musical vibe of the hits "Gonna Make You Sweat" and "Things That Make You Go Hmmm," while exploring more worldly, streetwise lyrics.



FREEDOM WILLIAMS

"It was important for me to show the world that I hadn't gone soft," Williams recently said between stops on a promotional tour of Florida. "I've learned a lot in the last few years—mostly what not to do. I wanted to incorporate some of those lessons into an album that has a lot of energy, with songs that have something to say."

Williams co-penned and -produced nine of the 12 cuts on "Freedom," mostly collaborating with newcomer **Mike More**. Others on board were former **Family Stand** members **Peter Lord** and **Jeffrey Smith**, and the legendary **Ashford & Simpson**, who contributed the aggressive "Respect." The song resulted from a chance meeting between Williams and **Nick Ashford**. "I saw Nick driving down the street one day, and he invited me to a barbeque at his home. We hit it off right away, and soon we were exchanging ideas."

A highlight of the project for the rapper occurred during the recording of its most creatively satisfying movement, "When I Rise," which lays uplifting rhymes atop a crafty blend of urban/funk beats and jazzy horns. "I remember when I was a studio gopher, being awestruck by [veteran musicians] **Marcus Miller** and **Jerry Hey**. It seemed inconceivable that I would ever get to make music with them. And there we were, hanging out in the studio and working on the arrangement to that song. It was a dream come true."

## Dance TRAX



*by Larry Flick*

With the music in place, Williams now is immersed in the task of bringing the music to the clubs and radio. Enhanced by **Kenny Gonzalez** and **Louie Vega's** underground-savvy house remixes, "Voice Of Freedom" is earning early kudos from DJs and crossover programmers in its first weeks of circulation. It bodes well for Columbia's plan to put Williams on the concert trail in midsummer. In fact, Williams already is assembling a band for the trek.

In the meantime, Williams is happy to be back with an album he believes will prove to people how important a factor he was in the overall success of C&C Music Factory.

"Robert and David did not give me the talent I have, or create my appearance," he says. "Those were things I brought to the project. C&C Music Factory was a joint effort that we could all be proud of. But all of that is behind me now. I'm more interested in looking forward, and taking this new music as far it can go."

THE SINGLE LIFE: One of the bigger buzz records out of Chicago right now is "I'm Leavin' You," a juicy garage/house jam by newcomer **Ulysses (Large/Triad)**. Perhaps the coolest thing about this record (beyond **Li'l John Coleman's** astute production) is that this sad tale of love-gone-awry is not being delivered by a finger-wavin' diva. After too many years of jock-holding street Romeos, it is refreshing to hear a deep, masculine voice handle the kind of sensitive material that made **Teddy Pendergrass** and **Barry White** famous. An added treat is Ulysses' fluid, live sax playing—also a nice break from the irritatingly overused samples that we're often served. A genius jam that deserves to break out of the underground.

It is a pleasure to welcome fierce diva-on-the-rise **Dina Carroll** back to the dancefloor with "Special Kind Of Love" (A&M), a sparkling, pop-laced twirler produced by **Robert Clivilles** and David Cole. The cute album version (reminiscent of the duo's work with **Mariah Carey**) is transformed into a festive peak-hour affair by C&C with assistance from **Ricky Crespo** and **Hex Hector**. For a delightful journey back to the '70s, delve into **Nigel Lowis'** plush mix, with its grand piano lines and pillowy strings. Import enthusiasts will need to snag the U.K. pressing, which includes a sweeping version of the song by **Brothers In Rhythm**, not to mention tasty **West End** renderings of "Ain't No Man" and "Express."

Producer/composer **Nicholas James Howler** blends the line dividing rave and house with "Crawler" (3Beat, U.K.), an instrumental he recorded under the name **Wobblehead**. Thick, driving beats are the unifying thread for floating synth effects and a spiraling melody line. Equally as strong are the spine-crawling "Angelic" and "Yuca's Army" on the flipside. Intense.

Erotic film actress **Heather Hunter** makes a credible transition into music with "I Want It All Night Long" (Great Jones/Island). Under the guiding hand of **Mike Cameron** and the **Smack Productions** posse, Hunter coos and vamps admirably, conjuring up images of '70s vixens **Andrea True** and **Sylvia**. Meanwhile, the beat-base is positively slammin', and ripe for play at several formats. Could be a sleeper hit with the right amount of promotional TLC.

### Billboard. HOT Dance Breakouts

FOR WEEK ENDING MAY 29, 1993

**CLUB PLAY**

1. U R THE BEST THING D:REAM SIRE
2. BOY POP BOOK OF LOVE SIRE
3. BAD MOOD LONNIE GORDON SBK
4. SHINE MIDI RAIN COLUMBIA
5. GET FUNKY WITH ME FIERCE RULING DIVA MEDICINE

**MAXI-SINGLES SALES**

1. BABY BE MINE BLACKSTREET MCA
2. RELIGION FRONT 242 EPIC
3. HEROIN BILLY IDOL CHRYSALIS
4. WHO'S THE MAN HOUSE OF PAIN TOMMY BOY
5. WHOOMP! THERE IT IS TAG TEAM LIFE

Breakouts: Titles with future chart potential, based on club play or sales reported this week.

The hi-NRG cover sweepstakes rages on with **Abigail's** techno-spiked reading of **k.d. lang's** recent pop/AC hit, "Constant Craving" (Klone, U.K.). The biggest asset of this record is the astonishing similarity in both singers' voices. Admittedly, hearing the song laid into a bright arrangement is weird at first. But an open mind ultimately will find the track an amusing interlude.

TID-BEATS: Get ready for the return of **Black Box**. The Italo-house group that enjoyed a string of hits from its 1991 album, "Dreamland," will be back in September with an **RCA** set fronted by former Brothers In Rhythm belter **Charvoni**. The act stirred up controversy last time around when **Martha Wash** was not credited as its primary vocalist. RCA is mulling over potential singles, the first of which is due in August . . . **Gloria Estefan** will try to build upon the recently revived interest of club jocks with house remixes of "Mi Tierra" (Epic), the title track of her forthcoming Latin-music album. Once again, **Tommy Musto** deftly handles postproduction duties. (How about someone getting TM and Glo together for a little direct collaboration?) **Pablo Flores** also contributes three mixes . . . Last week, we reported that **Jomanda's** new single, "I Like It" (**Big Beat/Atlantic**), had not been properly remixed for club play. We stand (somewhat) corrected. **E-Smoove** currently is primping the record with house beats for future release. A fine decision, but it does not erase the fact that the label first introduced a new record by a dance-rooted act to club DJs *without* a useful dance version. A day late, a dollar short? We'll see . . . Miami's up-and-coming **Murk Boys** have been keeping busy lately. They have added their unique touch to new singles by **Deborah Harry**, "I Can See Clearly" (Sire), and **Danni Minogue**, "This Is It" (MCA, U.K.) . . . **Pendulum** ingenue **Tené Williams** proves herself a formidable vocalist on her groovy eponymous album (see story, page 31). Though much of the set aims for top 40 and urban radio acceptance, clubsters should check out Williams' fun reading of **Jackie Moore's** disco nugget "This Time Baby," and "Jamie's Dream," a dreamy, downtempo jewel that is *begging* for a grand **Frankie Knuckles** remix . . . As compilation albums go, there really isn't anything stronger circulating right now than "Over The Edge" (**Jumpin' & Pumpin'**, U.K.), a two-record set that offers a glimpse into the vast and ever-evolving underground house and rave scenes overseas. There isn't a bad track to be found here, though a highlight is a pair of cuts from a promising new U.K. indie, **Bush Records**: "Can't Stop" by **Plez** and "The Throwdown" by **Bitch**. Import hounds, get crackin' . . . **Madonna's** fledgling **Maverick Records** will get a nice boost this summer from "Plantation Of Love" by stylish newcomer **Meshell**. A sneak peek of the album reveals her knack for literate rhyming and sultry singing, which are offset by a rich landscape of dance, R&B, and hip-hop grooves. No single has been chosen yet, though we are rooting for the sassy banji-girl anthem, "Boyfriend" . . . DJs in search of something unique (and oh-so-juicy) should seek out "The Bone Dance," the sorely underrated debut album by **E-Zee Posse (More Protein, U.K.)**. Mastermind **Jeremy Healy** serves up a delicious menu of club dishes, ranging in style from hearty house to slick hip-hop. In addition to the hits "Love On Love" and "Sun Machine," turntable hounds are advised to delve into "Vanity," a smoker fueled by occasional **Beatmaster** vocalist **Chris Ballan's** flashy turn. A huge hit just waiting to happen.

"When you said, 'Meet me at Le Dufy and let's monkey around,' this is not what I had in mind."



$109* "SUITE SAVER"
Le Dufy HOTEL DE LUXE
800-253-7997
1000 WESTMOUNT DRIVE
WEST HOLLYWOOD
CALIFORNIA 90069
*Offer based on availability. Tax and gratuity not included.
"Escape to the city within the city. . . West Hollywood, California"



www.americanradiohistory.com